## SHANNON v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1908.)

No. 1,489.

1. WOODS AND FORESTS—RESERVATIONS—GRAZING RIGHTS.

　　Where defendant drove large bands of cattle into a 320-acre pasture which was inclosed on three sides, but open on the side toward a public forest reserve, knowing that there was no water in the pasture, and that it was insufficient to sustain the cattle, and that they must, of necessity, drift onto the reserve for pasture and water, defendant could not claim freedom from responsibility for the cattle trespassing on the reserve because he at no time drove them there, and because the reserve was not inclosed.

**2.** SAME—IMPLIED LICENSE OF PASTURE.

The creation of a forest reserve severs the reserved land from the public domain, and appropriates it to public use so that it is no longer subject to the implied license to pasture on public lands.

**3.** SAME—USE—RULES—REASONABLENESS.

The rules promulgated by the Secretary of the Interior regulating the number of cattle and other live stock that may be pastured on a forest reserve, and the manner in which the owners may obtain permission to use the reservation for that purpose, are reasonable and within the power granted by Act Cong. June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1542), giving the Secretary of the Interior power to make rules and regulations, and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use, and to preserve the forests from destruction.

**4.** PUBLIC LANDS—CONGRESSIONAL POWER—STATE LEGISLATION.

The federal Constitution delegates to Congress the general power absolutely and without limitation to dispose of and make all needful rules and regulations concerning the public domain independent of the locality of the land, whether situated in a state or territory, the exercise of which power cannot be restricted in any degree by state legislation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 7.]

**5.** SAME—RELINQUISHMENT—CONGRESSIONAL POWER.

Congress had no power to relinquish any of its jurisdiction over the public domain by a compact with the state of Montana on admission of the state into the Union, nor had the state any power to reserve any such control.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 5-7.]

**6.** SAME—STATE STATUTES—STOCK AND FENCE LAWS.

Public lands in the state of Montana were not subject to the stock and fence laws of the state which were applicable only to lands subject to the state's dominion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 5-7.]

**7.** PUBLIC LANDS—GOVERNMENTAL CONTROL—ACTIONS.

Where the United States brought suit to restrain the trespass of defendant's cattle on a forest reserve, the fact that in such suit it acted in its proprietory capacity, and was subject to the ordinary rules of pleading, practice, and laws applicable to the case, did not operate as a waiver of any of its sovereign rights to the land sought to be protected.

**8.** INJUNCTION—DEFENSES—BURDEN ON DEFENDANT.

It was no defense to an injunction restraining defendant's use of a United States forest reserve as a pasture that its issuance would impose a grievous burden on him to restrain the cattle in his adjoining close, it also appearing that he could relieve himself of such burden by restoring a fence on one side thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 22.]

Appeal from the Circuit Court of the United States for the District of Montana.

For opinion below, see 151 Fed. 863.

The appellant was the defendant in a suit brought by the United States to enjoin him from driving, conducting, or causing or permitting to be driven or conducted, his live stock on the Little Belt Mountains Forest Reserve, and permitting the same to remain there. The bill alleged that during the month of December, 1904, and at divers times prior thereto, the appellant "wrongfully and unlawfully, and without right or authority, and without the consent and against the wishes of the complainant, the United States of America, and its officers and agents, and without having obtained a permit from the

Secretary of the Interior or the Commissioner of the General Land Office or any officer or agent of complainant, and in violation of law, and in utter disregard of the rules and regulations of the Secretary of the Interior, did drive and conduct, and cause to be driven and conducted, and permitted, suffered, and allowed to go onto and upon the said reserve, three hundred head of cattle," and the bill proceeded to allege that said acts would be continued unless enjoined, and would result in permanent and irreparable damage and injury to said reserve and be destructive of the objects for which the reserve was created. Upon the filing of the bill, a citation was issued requiring the appellant to show cause why an injunction pendente lite should not issue against him. On the hearing a temporary injunction was ordered as prayed for. From that order the present appeal is taken.

The Little Belt Mountains Forest Reserve was created by the proclamation of the President on August 16, 1902. The appellant is in the possession of a tract of 320 acres, which adjoins that part of the reserve known as Lone Tree Park, of which 320 acres he acquired 160 acres under the homestead law, and the remaining 160 acres he holds by a lease from one Peterson, the owner who acquired the same under the desert land act. The grazing privileges on the reserve are divided into districts. Lone Tree Park is in District No. 4. It contains about 1,000 acres. On September 3, 1902, shortly after the reserve had been established, the appellant obtained his lease of Peterson's 160 acres. As soon as he had obtained the lease, he turned from 3,000 to 3,500 head of sheep into the 320-acre tract, and later took them out and turned in cattle. When the appellant leased the land from Peterson, Peterson's land and his own were inclosed, but the appellant made openings in the Peterson fence on the side toward the reservation, for the purpose of letting stock through on the reserve. The evidence shows that the fence was down in 7 places, and that the gaps were from 30 to 90 feet wide. In some places the wires were weighted down with poles, in others with rocks. In other places the wires were raised, and placed on top of posts, so as to enable the stock to pass underneath. The evidence shows, moreover, that if the fence were maintained in good condition, stock could not obtain access to Lone Tree Park, because of the natural barriers which surround it. Every year since 1902, the appellant has thus grazed his cattle upon the reserve, without any permit, and has disregarded the rules governing the use of the reserve, and ignored the notices to keep his cattle off the reserve, given him by the forest ranger. The evidence shows that the appellant's tract of 320 acres would not furnish pasture to more than 50 head of cattle, and that there is no water on it, and that he would turn the cattle into the inclosure, and leave them there to drift over onto the reserve where there was pasture and water.

Ransom Cooper, for appellant.
Carl Rasch, U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The appellant denies that he has at any time driven his cattle upon the reserve, and asserts that if they went there, they did so of their own accord, the reserve not being inclosed by the United States, and that he is not accountable for the acts of the cattle in straying thereupon. We do not so regard the evidence, and we think the injunction issued by the court below may well be sustained on the ground that the evidence shows that the appellant drove his cattle upon the reserve. His home ranch was some 6 to 10 miles distant from the 320 acres inclosed near the reserve. He drove large bands of cattle within the 320 acres, which was inclosed on three sides, but open on the side toward the reserve, and left them there. Of course he knew that they would not and could not remain in the inclosure, for there was no

water there, nor sufficient pasture for so large a herd. They did as he evidently expected them to do. They went through the convenient openings which he had made in his fence for that purpose. In Lazarus v. Phelps, 152 U. S. 81–85, 14 Sup. Ct. 477, 478, 38 L. Ed. 363, the court said:

"So, if he lease a section of land, adjoining an uninclosed section of another, and stock his own section with a greater number of cattle than it could properly support, so that, in order to obtain the proper amount of grass, they would be forced to stray over upon the adjoining section, the duty to make compensation would be as plain as though the cattle had been driven there in the first instance. The ordinary rule that a man is bound to contemplate the natural and probable consequences of his own act would apply in such a case."

Counsel for the appellant seek support for their contention in the implied license to pasture on public lands, growing out of the custom by which such use has been permitted from the beginning of the government, and in the decision in Buford v. Houtz, 133 U. S. 320, 10 Sup. Ct. 305, 33 L. Ed. 618, in which the court recognized such license to use the public lands where they are left open and uninclosed, "and no act of the government forbids their use." But the lands included in a forest reservation are no longer public lands within the purport of that decision, and the act of the government does forbid their use. The creation of such a reservation severs the reserved land from the public domain, disposes of the same, and appropriates it to a public use. Wilcox v. McConnell, 13 Pet. 498, 10 L. Ed. 264. In pursuance of its policy of reserving for the public welfare, public lands on which is growing timber or undergrowth, for the preservation of the timber and the water supply, as provided in the act of March 3, 1891, c. 561, 26 Stat. 1103 (U. S. Comp. St. 1901, p. 1537), and, in order to make that act more effective, Congress passed the act of June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1542), whereby it vested in the Secretary of the Interior the power to "make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use, and to preserve the forests thereon from destruction." It was intended that this statute should be effective, and accomplish the results for which it was enacted. In pursuance of that authority, the Secretary of the Interior has promulgated rules regulating the number of cattle and other live stock that may pasture on the reservation, and the manner in which the owners thereof may obtain permission to use the reservation for that purpose. There can be no doubt that the rules are reasonable and are within the power so granted. In Dastervignes v. United States, 122 Fed. 30, 34, 58 C. C. A. 346, 350, this court said:

"Rule 13, promulgated by the Secretary of the Interior, is in accord with the provisions of the act of Congress, and in our opinion was a valid and legitimate exercise of the authority delegated to him to make such rules and regulations as would insure the objects of such reservations. The Secretary, in adopting this rule, acted simply as the arm that carries out the legislative will. He did not invade any of the functions of Congress. He did not make any law, but he exercised the authority given to him, and made rules to preserve the forests on the reserves from destruction. Such rules, within constitutional limits, have the force and effect of law, and it is the duty of courts

to protect and enforce them, in order to uphold the law as enacted by Congress."

But the appellant contends that he was not bound to maintain a fence between his land and the government reservation, nor to keep the fence that was there in repair, that he had the right to destroy or remove a fence which was his own property, and that it was for the appellee, if it desired to exclude live stock from the reservation, to inclose the same, or to take the necessary steps under the statutes of Montana to require adjacent proprietors to join in a division fence, and cites statutes of that state from which it appears that the Legislature has in substance declared that cattle may run at large in Montana, and that all owners who neglect to fence their lands against such stock shall be without remedy against the owners of animals which may trespass thereon, and argues that those laws are binding upon the United States as a landowner to the same extent that they are binding upon the owners of other lands situated within the state, and that the government, although in some positions and under certain defined conditions is a sovereign, it is, nevertheless, in the situation here presented, a mere private landowner, having the same rights, and no others, which are enjoyed by other landowners.

The federal Constitution delegates to Congress, absolutely and without limitations, the general power to dispose of and make all needful rules and regulations concerning the public domain, and this, independently of the locality of the public land, whether it be situated in a state or in a territory. Irvine v. Marshall, 20 How. 558, 15 L. Ed. 994; Jourdan v. Barrett, 4 How. 169, 11 L. Ed. 924; United States v. Gratiot, 14 Pet. 526, 538, 10 L. Ed. 573; Gibson v. Chouteau, 13 Wall. 99, 20 L. Ed. 534. The exercise of that power cannot be restricted or embarrassed in any degree by state legislation. This is the effect of the constitutional provision, unaided by the special provision usually incorporated in the compact by which the states are admitted into the Union. The provision in the Constitution of Montana, under which that state was admitted, declares "that the people of the proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof." The appellant contends that the portion of the ordinance just quoted is limited by the remainder thereof which follows:

"And to all lands lying within said limits owned or held by any Indian or Indian tribes, and until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

It is argued that from this latter provision, expressly acknowledging that the Indian land shall remain under the absolute jurisdiction and control of Congress, it was not the intention that other lands should be subject to such jurisdiction and control. But it is wholly unnecessary to enter into a discussion of the construction of this provision of the Constitution of the state of Montana. Congress had not the power to relinquish any of its jurisdiction over the public domain by any compact with that state, nor had that state the power to reserve any such control.

It is true that in Pollard's Lessee v. Hagan et al., 3 How. 212–223, 11 L. Ed. 565, concerning the powers vested in the state of Alabama on her admission into the Union, the following language was used in the opinion of the majority of the court:

"Nothing remained to the United States according to the terms of the agreement, but the public lands. And if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the United States, such stipulation would have been void and inoperative; because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain within the limits of a state or elsewhere, except in the cases in which it is expressly granted."

But the doctrine so announced that the United States has no general power to take lands within the boundaries of a state by the exercise of the right of eminent domain was expressly denied in the subsequent decision in Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449, and in Gibson v. Chouteau, 13 Wall. 92, 99, 20 L. Ed. 534, the court said:

"As legislation of a state can only apply to persons and things over which the state has jurisdiction, the United States are also necessarily excluded from the operation of such statutes. With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions and the mode of transferring this property or any part of it, and to designate the persons to whom the transfer shall be made. No state legislation can interfere with this right or embarrass its exercise."

In Camfield v. United States, 167 U. S. 519, 525, 17 Sup. Ct. 864, 867, 42 L. Ed. 260, the court said:

"The general government doubtless has a power over its own property, analagous to the police power of the several states, and the extent to which it may go in the exercise of such power, is measured by the exigencies of the particular case. * * * While we do not undertake to say that Congress has the unlimited power to legislate against nuisances with a state which it would have within a territory, we do not think the admission of a territory as a state deprives it of the power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the police power, so long as such power is directed solely to its own protection. A different rule would place the public domain of the United States completely at the mercy of state legislation."

In the light of these decisions, it is clear that the state of Montana had no dominion over the public lands lying within its borders, and no power to enact legislation directly or indirectly affecting the same. It could not give to the people of that state the right to pasture cattle upon the public domain, or in any way to use the same. Its own laws in regard to fencing and pasturing cattle at large must be held to apply only to land subject to its own dominion. No one within the state can claim any right in the public land by virtue of such a statute. The United States have the unlimited right to control the occupation of the public lands, and no obligation to fence those lands, or to join with others in fencing them for the purpose of protecting its rights can be imposed on it by a state. The rights given by the state statutes to the subjects of the state extend only to the lands of the state. They end at the borders of the government lands. At that border the laws of the United States intervene, and it is within their province to forbid

trespass. Such laws being within the power of Congress, it is not necessary to discuss the question whether it is sovereign power or police power, or what may be its nature, for there is no power vested in the state which can embarrass or interfere with its exercise.

The appellant makes the further point that a court of equity cannot recognize any sovereign right or power in a suitor appearing at its bar, and that the United States, having voluntarily come into court in its proprietary capacity as a landowner, seeking a remedy, must ask and receive equity upon the same terms and conditions that any private person or corporation may. We may concede this to be true. When the United States consents to be sued in a civil court, or resorts thereto for the protection of government property, or redress for injury to the same, it becomes subject to the rules of pleading, practice, and law applicable to the case. But it does not and cannot waive any of its rights in the subject of the controversy, and those rights must be protected by the court. The government does not appear here in a sovereign capacity or otherwise than as other suitors in a court of equity. The question for adjudication is, what are its rights under the averments set forth in the bill, and has the Legislature of Montana the power to enact legislation which shall affect the public lands within the borders of that state, or interfere with the right of the government to protect those lands? In Cotton v. United States, 11 How. 229, 13 L. Ed. 675, the court said:

"Although, as a sovereign, the United States may not be sued, yet as a corporation or body politic, they may bring suits to enforce their contracts and protect their property in the state courts or in their own tribunals administering the same laws."

The appellant argues that the maintenance of the injunction will impose a grievous burden upon him. But that objection is answered in the Camfield Case, in which the court said:

"The inconvenience, or even damage, to the individual proprietor, does not authorize an act which is in its nature a purpresture of government lands."

And, besides, the appellant may relieve himself of the grievous burden by restoring the Peterson fence.

The order of the Circuit Court is affirmed.