## CHICAGO, M. & ST. P. RY. CO. OF IDAHO v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. November 2, 1914.)

No. 2351.

1. WOODS AND FORESTS (§ 8*)—FOREST RESERVATIONS—RAILROAD RIGHT OF WAY.

Act March 3, 1875, c. 152, 18 Stat. 482 (Comp. St. 1913, § 4921 et seq.), containing a general grant of right of way for railroads over the public lands of the United States, provides in section 5 that the act shall not apply "to any lands within the limits of any military park or Indian reservation, or other lands especially reserved from sale," unless provided for by treaty stipulation or act of Congress. *Held*, that such exception applies to forest reservations created under Act March 3, 1891, c. 561, § 24, 26 Stat. 1103 (Comp. St. 1913, § 5121), and subsequent acts, and that the right to build a railroad over a forest reservation can only be acquired by the approval of the surveys and plats of the right of way by the Secretary of the Interior, as authorized by Act March 3, 1899, c. 427, § 1, 30 Stat. 1233 (Comp. St. 1913, § 4945).

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

2. WOODS AND FORESTS (§ 8*) — NATIONAL FOREST RESERVATION — ORDER OF EXECUTIVE DEPARTMENT.

An order by the Commissioner of the General Land Office, temporarily withdrawing from sale public lands pending the selection of lands for a forest reservation, is the legal equivalent of one signed by the President, and is effective to prevent the subsequent acquisition of a right of way over such lands by a railroad company, under Act March 3, 1875, c. 152, 18 Stat. 482 (Comp. St. 1913, § 4921 et seq.), where it is followed by a proclamation by the President creating the reservation thereon.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

3. PUBLIC LANDS (§ 92*)—RAILROAD RIGHT OF WAY—ACQUISITION OF RIGHT.

A railroad company acquires no right or title, as against the United States, to a right of way over public lands under Act March 3, 1875, c. 152, 18 Stat. 482 (Comp. St. 1913, § 4921 et seq.), until it has either constructed its road or filed a profile thereof, which has been approved by the Secretary of the Interior, as provided in section 4 of the act, and neither of such acts gives the company a right as of a prior date by relation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

4. WOODS AND FORESTS (§ 8*)—FOREST RESERVATIONS—APPROVAL OF RAILROAD RIGHT OF WAY—POWER OF SECRETARY TO IMPOSE CONDITIONS.

Act March 3, 1899, c. 427, § 1, 30 Stat. 1233 (Comp. St. 1913, § 4945), which provides that in the form provided by existing law the Secretary of the Interior may file and approve surveys and plats of any right of way for a railroad over and across any forest reservation, "when in his judgment the public interest will not be injuriously affected thereby," confers upon the Secretary power to make his approval subject to conditions prescribed by him to provide against threatened injury to the public interests, and to afford relief and reimbursement for such injuries as may actually be sustained; and in view of the power expressly conferred on him by Act June 4, 1897, c. 2, § 1 (4), 30 Stat. 35 (Comp. St. 1913, § 5126), to make rules and regulations to regulate the occupancy and use of forest reservations and to preserve the forests thereon, the Secretary may make general rules and regulations, to which all railroad companies which are permitted to construct their roads over such a reservation must agree to conform, as a condition to the granting of such right.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5.** SPECIFIC PERFORMANCE (§ 49*)—CONTRACTS ENFORCEABLE—AGREEMENT TO EXECUTE STIPULATION AND BOND.

Defendant railroad company, by its general counsel, entered into an agreement with an officer of the government forest service, reciting that it desired immediate permission to begin construction of its road over a national forest reservation, and agreeing that it would execute a stipulation to be prescribed by the government, "to be as nearly as practicable" like one previously executed by it relating to another forest reservation. The survey and plat of its right of way had not been approved by the Secretary of the Interior; but it was permitted to proceed and constructed its road through the reservation, after which it refused to enter into any stipulation. *Held*, that the agreement was based on a valuable consideration, and was binding on defendant, and that the United States could maintain a suit for its specific enforcement.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 140–151; Dec. Dig. § 49.*]

**6.** SPECIFIC PERFORMANCE (§ 32*)—CONTRACTS ENFORCEABLE—WANT OF MUTUALITY.

Want of mutuality cannot be predicated of an agreement wholly executed by the party seeking specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 89–99; Dec. Dig. § 32.*]

**7.** EQUITY (§ 39*)—JURISDICTION—RETENTION OF JURISDICTION TO GRANT COMPLETE RELIEF.

In a suit by the United States for the specific enforcement of an agreement by a railroad company to execute a stipulation and bond to protect the public interests from loss or injury by reason of the construction and maintenance of its road over a national forest reservation, a court of equity has incidental jurisdiction to award damages for injuries previously caused by defendant to timber in the reservation.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–114; Dec. Dig. § 39.*]

Appeal from the District Court of the United States for the District of Idaho; Frank S. Dietrich, Judge.

Suit in equity by the United States against the Chicago, Milwaukee & St. Paul Railway Company of Idaho. Decree for the United States, and defendant appeals. Affirmed.

For opinion below, see 207 Fed. 164.

On March 21, 1905, the Commissioner of the General Land Office made and published an order temporarily withdrawing from sale, pending a decision of the President as to the advisability of creating a national forest reserve, a large body of vacant, unappropriated public lands situate in the state of Idaho, and on November 6, 1906, the President, by proclamation, set apart as a public reservation, with the exception of some minor tracts, the lands thus temporarily withdrawn, to be known as the "Cœur d'Alene Forest Reserve."

On October 23, 1906, the defendant filed in the United States land office at Cœur d'Alene, Idaho, its profile, survey, and plat of a proposed right of way for a railroad through the reserve, traversing certain subdivisions particularly specified. On March 20, 1907, the defendant filed in the local land office an amended map and profile, changing the proposed route of its right of way, and the previous map was returned from the General Land Office without approval by the Secretary of the Interior. On May 10, 1907, the defendant filed in the local land office another amended map and plat of its proposed right of way through the reserve, differing from the last, and, in accordance with the practice, the first amended plat was also returned without approval. On the same day the defendant, desiring immediate permission to begin

construction of its railroad, acting through its general counsel, George R. Peck, entered into the following agreement in writing with the acting forester of the Forest Service:

"Whereas, the Chicago, Milwaukee & St. Paul Railway Company of Idaho desires immediate permission from the Forest Service to begin construction of the company's railroad in the Cœur d'Alene National Forest, Idaho, I hereby promise and agree on behalf of the company that it will execute and abide by stipulations and conditions to be prescribed by the forester in respect to said railroad; such stipulations and conditions to be as nearly as practicable like those executed by the company on January 18, 1907, in respect to its railroad within the Helena National Forest, Montana.

"Dated May 10, 1907. [Signed] Geo. R. Peck."

This agreement was indorsed:

"Approved and advance permission given to construct, subject to ratification hereof by the company.

"Dated May 10, 1907. James B. Adams, Acting Forester."

In pursuance of such agreement, defendant was permitted to and did at once enter upon the construction of its railway over and across the lands of the Cœur d'Alene Forest Reservation, and so continued until the road was completed; but in the meanwhile, on December 3, 1907, defendant informed the forester that it ought not to be required to file any stipulation whatever.

After entering into the agreement, the Secretary of Agriculture drafted a stipulation, and requested defendant to enter into and execute it, and on August 14, 1908, the Secretary of the Interior demanded of the defendant that it comply with the requirements of the Secretary of Agriculture as a condition precedent to the approval of defendant's map of May 10, 1907. The defendant refusing to comply with such condition, the map was, on October 29, 1908, rejected, and taken from the files of the Department of the Interior, and returned to defendant without approval by the Secretary.

The United States, for its bill of complaint, sets up these facts, and further shows, in effect, that on February 11, 1904, the Secretary of the Interior publicly promulgated certain regulations and conditions designed for the protection of the public interest respecting forest reservations, setting out such as are thought to have relation to the present controversy; that the stipulation prepared by the Secretary of Agriculture was as nearly as practicable like the stipulation referred to in the Peck agreement; that the defendant has, without regard to the terms and conditions of the stipulation agreed to be entered into, and wholly in disregard of the rules and regulations prescribed and required by the Secretary of Agriculture and the Secretary of the Interior for the protection of forest reserves, cut large quantities of timber upon the reserve, and has destroyed and is destroying and causing to be destroyed large quantities of young timber, has thrown and deposited great quantities of rock, earth, gravel, and débris in the St. Joseph river, thereby obstructing its navigation and rendering it unfit for use in driving logs, and has set and caused to be set fires along the right of way, which have escaped from control and destroyed other timber on the reserve, all to the great damage of plaintiff; that the defendant has been repeatedly warned against its acts of trespass and waste committed contrary to the terms of the proposed stipulation and the rules and regulations of the Department, but has wholly disregarded said warnings, and openly threatens and intends to continue such disregard of the requirements of the proper authorities of the government.

The bill prays that defendant be required to enter into the proposed stipulation, to cease obstructing St. Joseph river and trespassing upon the reserve, and to discontinue constructing or operating its railroad within said reserve until it shall have executed and filed with the Secretary of the Interior the required stipulation and complied with the rules and regulations pertaining to forest reserves, for damages for cutting timber, etc., and for further relief.

Exceptions to the bill and a demurrer were interposed and denied. The answer controverts the legal effect of the temporary withdrawal order of the Secretary of the Interior of March 21, 1905, as it pertains to the matters in suit, also the authority of that officer to promulgate the rules and regulations prescribed by the order of February 11, 1904, and avers that on February 17,

1906, the Secretary of the Interior accepted for filing and duly filed due proofs of the defendant company's organization, made in pursuance of the act of Congress of March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States," but did not accept the map of location of its proposed railroad, being the same as filed in the local land office, as alleged in the bill of complaint. The answer also controverts the alleged purpose and effect of the Peck agreement, or that defendant in pursuance of said agreement entered into possession of the right of way for advance construction of its railroad through the reserve, but admits that defendant through its general counsel informed the forester that it ought not to be required to file any stipulation in the premises.

Further answering, the defendant avers that long prior to the proclamation of November 6, 1906, it had, by virtue of the provisions of the act of March 3, 1875, and compliance therewith, acquired and become vested with all the rights, privileges, and authorities conferred and to be conferred by said act, and thereby was entitled to take for its railroad a right of way and to construct its road thereon, and to take from the public lands material, earth, stone, and timber necessary for construction purposes, without payment to the government, all without regard to any rights claimed to have been conferred by the agreement of March 10, 1907; that such agreement was wholly without consideration, and, further, that the Peck agreement was entered into under a mistake of fact on the part of both the United States and the defendant as to the rights the defendant had acquired for construction of its railroad across the reserve under the act of March 3, 1875, prior to the proclamation of the President setting aside such reserve. But, without this, it is further averred that the defendant has the right to the benefits of the act of March 3, 1875, without payment of compensation of any kind to the United States, and that for the foregoing reasons the defendant has refused to ratify or confirm the Peck agreement of May 10, 1907.

The answer further calls in question the reasonableness of the terms and conditions of the stipulation prepared by the Secretary of Agriculture, and known as "Exhibit G," as to whether it is as nearly as practicable in conformity to the conditions of the stipulation entered into with respect to the Helena Forest Reserve, and controverts the authority of the Secretary of the Interior to prescribe such or any conditions or impose the same upon the defendant. It admits the cutting of timber, but denies liability, and denies obstruction of the St. Joseph river, and all liability for destruction of timber by fire. Lastly, it is averred that defendant constructed its road over the reserve with full knowledge on the part of the United States that defendant had not ratified the Peck agreement, and that it had so and continuously refused to ratify the same, and that by reason thereof the plaintiff is estopped now to insist that defendant execute the stipulation referred to in such agreement.

After a hearing upon the evidence, the court pronounced in favor of the plaintiff, and the defendant appeals.

F. M. Dudley, of Seattle, Wash., H. H. Field, of Chicago, Ill., and Geo. W. Korte, of Seattle, Wash., for appellant.

J. L. McClear, U. S. Atty., of Cœur d'Alene, Idaho, J. R. Smead, Asst. U. S. Atty., of Boise, Idaho, D. F. McGowan, Asst. Sol., Department of Agriculture, of Missoula, Mont., for the United States.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] The primary contention hinges largely upon the purposes and intendment of the act of March 3, 1875 (18 Stat. 482), and later acts respecting forest reserves. By the first section of the act of 1875 a right of way through the public lands of the United States is granted

to any railroad company, organized under the laws of any state, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation and due proofs of its organization under the same, to the extent of 100 feet on each side of the center line of said railroad; also the right to take from the public lands adjacent to the line of road material, earth, stone, and timber necessary for the construction of the road; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount 20 acres for each station, to the extent of one station for each 10 miles of road. Section 4 provides:

"That any railroad company desiring to secure the benefits of this act shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way."

And section 5:

"That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale, unless such right of way shall be provided for by treaty stipulation or by act of Congress heretofore passed."

Under an act entitled "An act to repeal timber culture laws, and for other purposes," adopted March 3, 1891, the President of the United States was authorized to set apart and reserve, from time to time, in any state or territory having public land bearing forests, any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations; the same to be by public proclamation declaring the establishment of such reservations and the limits thereof. 26 Stat. 1103. By a clause contained in an act making appropriations for sundry civil expenses of the government for the year 1897, adopted June 4, 1897, the Secretary of the Interior is authorized to make provision for protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside, or which might thereafter be set aside under the act of March 3, 1891, and to make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction. By the same act the Secretary of the Interior is authorized and empowered, under such rules and regulations as he may prescribe, to sell and dispose of the dead timber and matured and large growth trees found upon such reservation (30 Stat. 35); and the President is authorized to modify executive orders establishing forest reserves, and to vacate the same altogether (30 Stat. 36).

By another act making appropriations to provide for deficiencies, adopted March 3, 1899, this clause was inserted, namely:

"That in the form provided by existing law the Secretary of the Interior may file and approve surveys and plats of any right of way for a wagon road, railroad, or other highway over and across any forest reservation or reservoir site when in his judgment the public interests will not be injuriously affected thereby." 30 Stat. 1233.

For some time prior to the adoption of the act of March 3, 1875, it had been the policy of the general government to grant by special acts rights of way for railroads over the public lands, and these carried their own terms and conditions. No doubt believing the purpose could as well be subserved by a general act, Congress adopted the act of 1875.

Much discussion is indulged in respecting the meaning and legislative significance of the words "public lands," as contained in section 1 of the act; but we are not impressed that it is necessary to enter at all upon that inquiry, as we believe that section 5 affords a sufficiently clear interpretation of the statute for the purposes of this case. That section makes the act inapplicable to any lands within the limits of any military, park, or Indian reservation, or other lands specifically reserved from sale. It is the cardinal policy and purpose of Congress and the general government that the lands comprised within forest reservations shall be specially reserved from sale and disposal to settlers and other persons, except as more recently expressly provided by law, while such reservations remain unrevoked by direction or order of the President. As said in Shannon v. United States, 160 Fed. 870, 873, 88 C. C. A. 52, 55:

"The creation of such a reservation severs the reserved land from the public domain, disposes of the same, and appropriates it to a public use."

Nor does it seem to us that the rule ejusdem generis helps the respondent, for national forest reserves are set apart for a definite, permanent, and public use, the same as are military, park, and Indian reservations, only that the use is different. So is the use of a military reserve different from that of a park reserve or an Indian reservation, and an Indian reservation from that of a park, but all are created and set apart for special governmental use. And a forest reserve, under the conservation policy of the government, is just as essential and vital to the effectuation of the government's purposes in that direction as a military reserve, a park, or an Indian reservation for the purposes of the government to the ends for which they are respectively established.

"Congress establishes a forest reserve for what it decides to be national and public purposes." Light v. United States, 220 U. S. 523, 537, 31 Sup. Ct. 485, 488 (55 L. Ed. 570).

Congress by later enactments has so interpreted the act. This is evidenced by an act of July 8, 1898, c. 645 (30 Stat. 729, c. 645), and another of January 10, 1899 (30 Stat. 783, c. 44). The first of these acts grants a right of way to the Cripple Creek Short Line Railway Company through the Pikes Peak Timber Land Reserve, "subject to the rules and restrictions and carrying all the rights and privileges" of the act of March 3, 1875, but providing "that no timber shall be cut by said railroad company for any purpose outside of the rights

of way," thus impliedly recognizing that the act of March 3, 1875, was without application to a forest reserve. Otherwise it would seem that Congress would not have specially made applicable the rules and restrictions of said act, and declared that all the rights and privileges thereof should be read into the act then adopted. Again, the provision touching the cutting of timber outside of the right of way was a restriction upon the act of 1875.

The second act (January 10, 1899), grants the right of way to the Saginaw Southern Railroad Company through the San Francisco Mountains Forest Reserve, a reserve set apart and established by President McKinley, "said right of way being granted subject to the rules and restrictions and carrying all the rights and privileges" of the act of 1875. It must have been the view of Congress that without these enabling acts a railroad company had no right, under the act of 1875, to cross forest reserves; otherwise there was no need of their enactment.

For other acts of like nature, see Act May 28, 1896, c. 258; 29 Stat. 190, Act June 6, 1896, c. 336, 29 Stat. 253, Act May 18, 1898, c. 343, 30 Stat. 418, and Act Feb. 28, 1899, c. 223, 30 Stat. 910.

So also, is the act of March 3, 1899, in full recognition of the same thought. In form provided by existing law, the Secretary of the Interior is authorized to approve surveys and plats of rights of way for railroads across any forest reservation, thus delegating the power that Congress formerly exercised in that respect to the Secretary of the Interior. Judicial interpretation, so far as authorities have been cited, is the same way. United States v. Bailey (C. C.) 178 Fed. 302.

[2] We may next inquire whether the defendant company acquired a right of way under the act of 1875 prior to or pending the setting aside and establishment of the Cœur d'Alene Forest Reserve. To recall the pertinent facts: The Commissioner of the General Land Office temporarily withdrew from sale and disposal the lands comprised in the reserve March 21, 1905. On February 17, 1906, due proofs of the company's organization, under the laws of the state of Idaho, were by the Secretary of the Interior accepted and filed in his department. On October 23, 1906, the defendant filed in the local land office its profile, survey, and plat of its proposed right of way through the reserve. An amended map was filed March 20, 1907, and a second amended map May 10, 1907. The first two of these plats were returned from the General Land Office when the amendments were presented for approval, and the last was finally taken from the files, also without approval, by the Secretary of the Interior. Previous, however, to the filing of either of the amended maps, namely, on November 6, 1906, the President by his proclamation finally established the reserve. Thus it will be seen that initiatory steps had been taken to create the Cœur d'Alene reservation before the defendant was even organized, and long before it attempted to file any map or profile of the location of its right of way across the reserve, and the company twice amended its map of survey and final location after the President had issued his proclamation finally establishing the reserve, changing its route in material particulars each time.

The Secretary of the Interior has long exercised the authority of withdrawing specific lands from settlement and sale. Especially has this been so with respect to withdrawals to satisfy the requirements of land grants for railway and other purposes. These withdrawals operate effectively to prevent the inception of any right under the preemption and homestead laws. Hamblin v. Western Land Co., 147 U. S. 531, 13 Sup. Ct. 353, 37 L. Ed. 267, and cases cited. But a withdrawal by the head of a department is tantamount to a withdrawal by the President. The executive acts through the heads of departments, and their acts in many of the larger affairs of state are his acts.

In an early case in the Supreme Court (Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264), it appears that the Secretary of War requested the Commissioner of the General Land Office to direct a reservation of lands to be made, and one was accordingly made, for military purposes, and the act of the Secretary of War in this respect was held to be the act of the President. In another case (Wolsey v. Chapman, 101 U. S. 755, 25 L. Ed. 915), where the Commissioner of the General Land Office directed the registers and receivers of the local land offices to withhold from sale all odd-numbered sections within a described area, the Supreme Court, speaking through Chief Justice Waite, applies this reasoning:

"If the President himself had signed the order in this case, and sent it to the registers and receivers who were to act under it, as notice to them of what they were to do in respect to the sales of the public lands, we cannot doubt that the lands would have been reserved by proclamation within the meaning of the statute. Such being the case, it follows necessarily from the decision in Wilcox v. Jackson that such an order sent out from the appropriate executive department in the regular course of business is the legal equivalent of the President's own order to the same effect."

The reasoning is apt as it respects the case at bar. The Commissioner of the General Land Office by order withdrew the lands comprised within the reserve from sale and disposal, and although it was pending an investigation as to what lands should be finally included within a reserve, it was in effect the act of the President and tantamount to an executive order for that purpose, so that thenceforth the land was especially reserved from sale. This in itself would seem sufficient to preclude the defendant from the acquirement of a right of way over the reserve under the act of 1875.

[3] But it has been further established, and by recent cases, that the grant to railroad companies under the act of 1875 may take effect in two ways: First, upon a construction of the road; and, second, upon the approval of the Secretary of the Interior after the definite location and filing of a profile of the road in the local land office. Jamestown & Northern Railroad Co. v. Jones, 177 U. S. 125, 20 Sup. Ct. 568, 44 L. Ed. 698; Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Doughty, 208 U. S. 251, 28 Sup. Ct. 291, 52 L. Ed. 474. It was held in the latter case that a valid homestead entry, made after final survey, but before either the construction of the road or the approval by the Secretary of the Interior of the profile, is superior to the rights of the company in acquiring the right of way.

Neither of the conditions ascertained by these cases was complied with by defendant prior to the temporary withdrawal; nor were they wholly complied with prior to the proclamation of the President finally setting aside and establishing the reserve.. True, the railroad company had organized, and had filed with the Secretary of the Interior due proofs of such organization, and had also filed in the local land office a survey and plat of its proposed right of way through the reserve prior to the President's proclamation; but that map and plat lacked the approval of the Secretary of the Interior, so that when the reserve was established the company had not acquired its right of way under the provisions of the act of 1875.

It is urged that the cases last cited pertained to the correlative rights of the parties as between the railroad company and the settler, and that the doctrine announced ought not to apply as between the railroad company and the government. And in this relation it is further urged that when the right of way was finally located the company took title thereto by relation back to the time of making due proofs of organization and filing such proofs with the Secretary of the Interior. This under the doctrine as promulgated touching grants of lands to railway companies, that when the location of a road is finally established the grant takes effect by relation back to the date of the grant, and by a fiction of law the grant is called one in præsenti. As said in Railway Co. v. Alling, 99 U. S. 463, 475 (25 L. Ed. 438):

"When such location and appropriation were made, the title, which was previously imperfect, acquired precision, and by relation took effect as of the date of the grant."

See, also, Schulenberg v. Harriman, 21 Wall. 44, 22 L. Ed. 551; Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. 336, 27 L. Ed. 201.

The grant was termed a float in the meanwhile; but the title passed to no specific land, because it lacked identification. But the analogy to the present case is not apparent. Here counsel would treat the right of way as a float when the right of way is dependent absolutely upon its own definite location. It is not a grant of lands dependent upon a location of the road, but a right of way dependent upon its own location. No preliminary or other location is indicated by the proofs of organization. Article 8 of the articles of incorporation indicates that the company intends to construct a road from some point to be located on the east boundary line of the state of Idaho, between the forty-sixth and fifty-seventh degrees of north latitude, thence extending in a general westerly direction to some convenient point to be located on the west boundary line of the state. To call the right of way dependent upon such a designation of the probable termini and route of the road a float would manifestly be a palpable misnomer. It could not by any stretch of the imagination be so termed. As was said in Jamestown & Northern Railroad Co. v. Jones, supra:

"Different considerations apply to the grant of lands than to the grant of the right of way."

While the filing of proofs of organization authorizes the railroad company to locate its right of way over public lands, it acquires no

particular route or right of way until it has either actually constructed its road or complied with section 4 in locating, filing, and having approved the profile of its right of way; and this applies as between the railroad company and the government. Indeed, in a later case, Stalker v. Oregon Short Line, 225 U. S. 142, 151, 32 Sup. Ct. 636, 639 (56 L. Ed. 1027), the Supreme Court interprets what was said in the opinion of the court in Railway Co. v. Doughty about the grant of the right of way being dependent upon three things, naming them, as referring—

"to the nonvesting of any right as against the United States, and not as denying the priority of right in the acquisition of the premises as between parties growing out of priority of application."

We see no escape from the conclusion that the government's establishment of the reserve is paramount, that the lands comprised thereby were especially reserved from sale, and that the defendant railway company failed in the acquirement of a right of way for its railroad across the reserve in pursuance of the act of 1875.

[4] It being ascertained that a forest reserve is excepted from the operation of the act of March 3, 1875, and that the defendant railroad company did not, by what it did, acquire a right of way over the Cœur d'Alene Reserve prior to its establishment through withdrawal of the lands comprised therein from sale by the Commissioner of the General Land Office and by the proclamation of the President, it remains to be seen by what authority, right, or method a railroad company may acquire such right of way.

The government's position is that the act of March 3, 1899, not only affords the means by which such a right of way may be acquired, but that it is potent to authorize the Secretary of the Interior to prescribe rules and regulations to be observed and the conditions, within reasonable bounds, upon which a railroad company may obtain the privilege contemplated.

The act provides that in form provided by existing law, the Secretary of the Interior may file and approve surveys and plats of any right of way for a railroad over and across any forest reservation, when in his judgment the public interests will not be injuriously affected thereby. It is somewhat obscure, and just what Congress intended to accomplish by its adoption is not readily apparent; but one thing seems to be of clear intendment, and that is that the Secretary of the Interior shall only file and approve surveys and plats of rights of way when in his judgment the public interests will not be injuriously affected. In other words, the Secretary of the Interior is made the arbiter as to when such surveys and plats shall be approved, and without such approval it is plain that a railroad company cannot acquire a right of way across a forest reserve. If in his judgment the public interests would be injuriously affected, it would seem he could prevent, by refusal to approve the surveys and plats, any occupation of the reservations for right of way purposes. Having the power to prevent, it would seem to follow that he also has the power to approve surveys on conditions that would provide against threatened in-

jury to the public interests, and also afford relief and reimbursement against such as might actually be sustained.

Acting upon this principle, the Secretary of the Interior has, for the exercise of his judgment in the premises, heretofore adopted and promulgated certain rules and regulations and prescribed certain conditions calculated to safeguard the public interests in that regard. These require of the applicant for a right of way a stipulation that the right of way shall not be so located as to interfere with the proper occupation of the reservation by the government; that the applicant will cut no timber outside of the right of way; that he will remove no timber within the right of way, except as rendered necessary by the proper use and enjoyment of the privilege; that he will remove from the reservation, or destroy under proper safeguards, all standing, fallen, or dead timber, etc., for such distance on each side of the central line as may be determined by the General Land Office to be essential to protect the forest from fire, and will also furnish men and materials for fighting fire, if it can be done without serious injury to applicant's business. Such rules and regulations also require the applicant to execute a bond to the government, conditioned that the makers thereof will pay—

"for any and all damage to the public lands, timber, natural curiosities, or other public property on such reservation, or upon the lands of the United States, by reason of such use and occupation of the reserve, regardless of the cause or circumstances under which such damage may occur."

No construction can be allowed until an application for the right of way has been regularly filed in accordance with the laws of the United States and has been approved by the Department, or has been considered and permission specifically given. The regulations have since been changed, so that the applicant must enter into stipulation and execute such bond as the Secretary of Agriculture may require for the protection of such reserves.

Now, referring to the authority expressly conferred upon the Secretary of the Interior by the act of June 4, 1897, to make rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction, thus delegating to such department a broad scope of regulation touching forest reservations, it would indicate that when the act of 1899 was adopted, Congress assumed that the Secretary already had ample power and authority to regulate by rule and the imposition of proper conditions the occupation generally of forest reserves, and the especial purpose of that act was to render the power specific as respects occupation for right of way for railroad purposes; hence the peculiar wording of the act.

The authority accorded the Secretary of the Interior to exercise his judgment for the conservation of the public interests respecting forest reserves carries with it, by strong implication, the authority to make rules and regulations for the better and more efficacious exercise of his judgment. The act of adopting such rules and regulations is not legislative, but merely administrative for enforcing the

law, specially given into his charge to provide ways and means for its due execution and enforcement. In general, the power to make rules and regulations must be granted expressly or by necessary implication; otherwise, it cannot be lawfully exercised. Van Lear v. Eisele (C. C.) 126 Fed. 823, 827.

But we think in the present case the power exercised by the Secretary of the Interior in making the rules and regulations in question, and to prescribe the conditions imposed, is clearly implied by the terms of the statute in view of the previous legislation pertaining to the conservation of forest reserves. The conclusion thus deduced touching the power and authority of the Secretary of the Interior respecting the forest reserves, and the approval of surveys and plats of rights of way across such reserves, affords ample consideration for upholding the Peck agreement, for the agreement was entered into upon the condition that the defendant company should have immediate permission from the Forest Service to begin construction of its railroad through the reserve.

[5] This brings us to the contention of appellant that the respondent is not entitled to equitable relief. The purpose of the bill of complaint is to require specific performance of the Peck agreement, in that the defendant company shall execute and abide by stipulations and conditions to be prescribed by the forester in respect of defendant's railroad, such stipulations and conditions to be as nearly as practicable like those executed by the defendant company on January 18, 1907, with relation to its railroad within the Helena National Forest, Montana, and, further, that the defendant company shall respond in such damages as the plaintiff has sustained in the meantime by reason of the defendant's construction of its railroad across the reserve and occupation of the right of way therefor. Specific performance is a well-established head of equitable jurisprudence, and it is wholly unnecessary to cite authority to that purpose. The several objections assigned as to why the bill is without equity may be disposed of seriatim.

It is first urged that there was no authority vested in the Executive Department to consent to a railway company which was not a qualified beneficiary under the act of 1875 entering upon the public lands for the purpose of constructing a railroad thereon. This objection is disposed of by what has been previously determined as to the power and authority of the Secretary of the Interior to approve surveys and plats of rights of way over the forest reservations. So, also, has the objection been disposed of that there was no consideration for the promise embodied in the agreement.

The third objection is that the undertaking is an agreement to make an agreement, and that specific performance of such an engagement will not be decreed. This is the general rule, no doubt. But contracts of insurance and indemnity and agreements for the execution of formal contracts of security constitute well-settled exceptions to the general rule. 36 Cyc. 567. The stipulation agreed to be executed is in the nature of a contract to indemnify and save harmless the United States, and as further security against any damage that might result

from the construction of defendant's railroad and the occupancy of the right of way across the reserve for railroad purposes.

The fourth objection is that the stipulation demanded in the bill is not essentially the same as the one agreed to be executed under the Peck agreement. Some reference to the pleadings and the facts is necessary to an understanding of the situation. Prior to the institution of the suit the Secretary of Agriculture prescribed a form of stipulation, a copy being attached to the bill of complaint and marked "Exhibit G." A copy also of the stipulation entered into relative to the Helena Forest Reserve is found in the evidence. A comparison of these two documents indicates a material difference between them, and, while the court is not disposed to require an execution of Exhibit G, we think complainant is entitled to an execution on the part of the railroad company of a stipulation "as nearly as practicable like" the one executed January 18, 1907, respecting the Helena Forest Reserve. The scope of the relief prayed is broad enough to require an execution of the stipulation, if the plaintiff is otherwise entitled to equitable relief.

It is further urged in this relation that the plaintiff made no tender of any stipulation, approximating as nearly as practicable the Helena stipulation, for defendant's execution. This was unnecessary under the facts developed, as in the end the defendant declined to sign any stipulation as required by the Peck agreement.

The next objection is that the Peck agreement is too uncertain for specific performance. That is certain which is capable of being rendered certain. The Helena contract was touching the approval of a survey and plat of a right of way across a reserve under conditions similar to those obtaining in respect to the Cœur d'Alene reserve, and it was manifestly not a difficult task to suit the stipulation to the slight difference in conditions that really existed. The controlling features were practically the same in each case. We therefore deem the Peck contract susceptible of specific performance. Hebert v. Mutual Life Ins. Co. (C. C.) 12 Fed. 807.

The next objection is that the Peck agreement is lacking in mutuality. Peck was the general counsel of the defendant railroad company, and unquestionably authorized, in furtherance of its purpose in acquiring a right of way across the Cœur d'Alene Reserve, to enter into just such an agreement as he did. In implicit reliance upon said agreement, and in full pursuance of its intendment, the plaintiff, acting through its duly authorized officer, granted immediate permission to enter upon the construction of its railroad across the reserve, and this prior to any approval of the surveys and plat of the company's right of way. Having entered upon the construction of its railroad, the defendant so continued without interference on the part of the government until the latter part of November, 1907, when the stipulation Exhibit G was presented for execution. Execution was declined pending certain negotiations in Washington, D. C., and in the meanwhile the defendant was allowed to continue in its construction without compliance with the requirements of the Forest Service, and it so continued to proceed with the work until it had fully

completed its construction work for the full distance across the reserve, and is now in the operation of its railroad.

[6] The outcome of the controversy is this suit, called a friendly suit to determine the correlative rights of the parties litigant. The agreement was wholly executed on the part of the government the moment it granted permission to the defendant to enter upon construction. If not then, it has since been so amply executed that there can no longer be any question about it. Want of mutuality cannot be predicated of an agreement wholly executed by the party seeking specific performance. Mississippi Glass Co. v. Franzen, 143 Fed. 501, 74 C. C. A. 135, 6 Ann. Cas. 707. In this case is found a quotation from Grove v. Hodges, 55 Pa. 504, 516, which states the doctrine explicitly as follows:

"Want of mutuality is no defense to either party, except in cases of executory contracts. It has no applicability to an executed bargain. There are many where the obligation is all upon one party. As to one, the obligation was fulfilled; the contract was executed when it was made. As to the other party, it remained executory. A consideration may be either something done, or something to be done, or a promise itself. When it is something already done, it is idle to talk of want of mutuality. That is to be considered only when the obligations of both parties are future."

But counsel insist that advance permission was given subject to ratification by the company, and that the company has never ratified the Peck agreement. It has, however, availed itself to the fullest extent of the very advantages which it sought to acquire, and did acquire, by virtue of the agreement. While delaying express ratification, it continued in the exercise and enjoyment of the right and privileges extended in pursuance of the agreement until it got absolutely everything it wanted, and now seeks, through the instrumentality of a friendly suit, to have the agreement declared nonenforceable because not ratified by it. It is too late, after enjoying the full benefits extended under the agreement, to insist now that defendant should not be required to perform because it has not expressly ratified such agreement.

It is further suggested that the defendant company had no knowledge of the agreement until Exhibit G was presented for execution. But this knowledge is imputed from the fact that the agreement was executed by the general counsel of the company, and, having been done in the line of his authority and in pursuance of an explicit duty enjoined, the company is bound to know what he did in that relation.

Another objection is that the agreement was signed under a mistake of fact on the part of Mr. Peck. But this cannot go to the sufficiency of the bill, as it is set up as a defense, and is to be determined upon the evidence adduced. The trial court has found against the defendant on the issue, and we approve the findings in that respect. We think it clear that the bill states facts pertinent and sufficient to entitle the plaintiff to specific performance of the Peck agreement.

[7] Again, it is insisted that the bill is multifarious, and that a court of equity is without jurisdiction to award money damages. Several items of damages are claimed, such as for obstructing St. Joseph river with débris, for timber destroyed by fire, caused by the escape

thereof through want of proper precautions, and for timber cut in clearing the right of way. But it is urged that these items are each and all subjects for actions at law, and, having been combined in a demand for relief in one bill, render the bill multifarious. A court of equity, having acquired jurisdiction for one purpose, may generally award incidental relief, although such relief may be legal rather than equitable. All these demands for damages are merely incidental to the main suit for specific performance of the Peck agreement, and equitable jurisdiction is clear to afford entire relief in one suit.

The idea of the bill is to require due execution of the stipulation and bond, as contemplated by the Peck agreement, and to recover what damages the government has suffered in the meantime, in pursuance of the stipulation and bond, had they been given as agreed. Whatever damages might arise in the future would be provided against by the stipulation and bond executed under the decree of the court. In this view of the case, the damages prayed are but incidental to the main suit, and the bill is therefore not multifarious.

The trial court directed a form of stipulation to be entered into, one which the parties themselves had agreed to after the main decision was rendered, with an additional provision that it should be effective as of date May 10, 1907, and awarded damages in the aggregate of $68,489.

Being of the opinion that no error was committed, the decree of the District Court is affirmed; and it is so ordered.