HARTMAN v. WARREN et al.

(Circuit Court of Appeals, Eighth Circuit. September 14, 1896.)

No. 767.

1. PUBLIC LAND—LOCATION—INDIAN TREATY.
    The location of a tract of public land by an alleged beneficiary under the seventh clause of the second article of the treaty of September 30, 1854 (10 Stat. 1109), between the United States and the Chippewa Indians of Lake Superior, segregates the tract from the public domain and appropriates it to private use.

2. SAME.
    While such a location remains in force, Porterfield warrants issued under the act of April 11, 1860 (12 Stat. 836) cannot be lawfully located on the same land, because that land has been otherwise appropriated by the prior location whether right or wrong.

3. DECISION OF LAND DEPARTMENT.
    The adjudications of the land department upon questions within its jurisdiction, if erroneous, are not void, but are valid until reversed on appeal or set aside by proper direct proceedings for that purpose.

4. PRE-EMPTION ENTRY.
    An entry of land under the seventh clause of the second article of the treaty of September 30, 1854, supra, is not a pre-emption entry, and one who contests it acquires thereby no right to be preferred in the purchase or acquisition of the land under section 2 of the act of May 14, 1880 (21 Stat. 140, 141, c. 89, § 2).

5. LOCATION OF LAND—ENFORCEMENT OF TRUST.
    One who is not in privity with the United States, and who did not acquire any right to be preferred in the acquisition of a tract of land, before the claim to it upon which it was patented was initiated, may not maintain a bill in equity to subject the holder of the legal title to a trust in his favor on the ground that the patent was issued through errors in law.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Minnesota.

This is an appeal from a decree which sustained a demurrer to a bill in equity and dismissed the bill. Emil Hartman, the appellant, brought this bill in the court below against James H. Warren and his immediate and remote grantees, the appellees, to obtain a decree of that court that those of the appellees who then held the title to lot 7 and the N. E. ¼ of the S. W. ¼ of section 30, township 63 N., of range 11 W., in the county of St. Louis, in the state of Minnesota, held it in trust for his benefit. The United States issued their patent for this land to the appellee Warren on December 11, 1894, and the title held by the appellees rests upon this patent. The theory of the bill is that the land was patented to Warren through errors of law made by the officers of the land department, when it would have been patented to the appellant if these officers had rightly decided the legal questions presented to them in the case. The allegations of the bill, so far as they are material to the determination of the decisive questions upon this appeal, disclose this state of facts: By the seventh clause of the second article of the treaty concluded between the United States and the Chippewa Indians of Lake Superior and the Mississippi, on September 30, 1854, it was agreed that "each head of a family or single person of age at the present time, of the mixed bloods belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the president, and which shall be secured to them by patent in the usual form." 10 Stat. 1109. Warren is and always has been a citizen of the United States. He was the son

of a father who was a native-born citizen of the United States, and of a mother who was a mixed blood, half French and half Chippewa Indian of Lake Superior. He was a married man, and a resident and citizen of the state of California, when the treaty was made, and never lived with or in the vicinity of any band of Chippewa Indians. He nevertheless claimed that he was a mixed blood belonging to the Chippewas of Lake Superior, and on January 22, 1875, the commissioner of Indian affairs, by direction of the secretary of the interior, so found, and issued to him a certificate of identity, to the effect that he was one of the persons referred to in the clause of the treaty quoted, and that he was entitled to locate 80 acres of land under the provisions of that treaty. On January 20, 1885, Warren sold this certificate of identity to one Joseph H. Sharp, and executed two powers of attorney to him, one to empower him to locate in Warren's name the 80 acres to which he claimed to be entitled under the treaty, and the other to empower him to sell and convey this land. On October 15, 1885, Sharp located the land in dispute in this case in the name of Warren, under his power of attorney for that purpose. On the same day, he sold and conveyed it in the name of Warren to the appellee, Christian Kortgaard, under his power of sale. On December 22, 1894, the government patented the land to Warren upon this location. Meanwhile, on March 11, 1889, the appellant, Hartman, applied to the register and receiver of the proper local land office to locate and enter this land with Porterfield warrants issued under the act of congress, approved April 11, 1860, which provided that the secretary of the interior should issue these warrants to the executors of the last will and testament of Robert Porterfield, "to be by them located on any of the public lands which have been or may be surveyed and which have not been otherwise appropriated at the time of such location." 12 Stat. 836. The register and receiver rejected this application, on the ground that the land was embraced in the entry of Warren. On March 19, 1889, Hartman appealed from this decision to the commissioner of the general land office, and filed with the officers of the local office an application to contest the entry of Warren, on the grounds that the location of October 15, 1885, was not made by or for him, that he was not entitled to locate the land, and that he had unlawfully parted with his certificate of identity before the entry was made. The commissioner affirmed the decision of the register and receiver and dismissed Hartman's application to contest. Hartman appealed to the secretary of the interior. The secretary reversed the decisions of the officers below, and directed the register and receiver to hear the contest. They heard it in January, 1893. Counsel for Hartman claim that the allegations of his bill show that on the hearing of this contest Hartman proved by uncontradicted testimony the facts which we have recited, as to the citizenship and residence of Warren, as to his mixed blood, as to his relation (or, rather, want of relation) to the Chippewa Indians of Lake Superior and the Mississippi, and as to his sale of his certificate of identity, before his location was made. For the purposes of this decision we shall concede this to be the legal effect of the averments of this bill, although it may be that we should be forced to the conclusion that the bill discloses that there was contradictory evidence before the officers of the land department at the hearing upon the contest sufficient to warrant their findings, as matter of fact, if that question were material in our view of this case. The officers of the local land office held that Warren was a beneficiary under the treaty, that he had the power to sell his right to locate the land, and had the right to make the two powers of attorney before he made his location, that his entry and location of the land in dispute were valid, and that Hartman's contest should be dismissed. After a hearing upon an appeal from this decision, the commissioner of the general land office affirmed it. On an appeal from this decision of the commissioner, the secretary of the interior affirmed it, and the land was patented to Warren. The appellant alleged that these decisions upon the hearings upon his contest were erroneous in law, and that he is, consequently, entitled to the relief sought by his bill.

James O. Broadhead, D. P. Dyer, and William W. Billson (P. H. Seymour, Chester A. Congdon, and Daniel A. Dickinson, with them on the brief), for appellant.

James K. Redington (J. M. Wilson, S. F. White, T. J. McKeon, George P. Wilson, and John R. Van Derlip, with him on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The appellant attacks the patent of the United States, under which the appellees hold this land, on the ground that the patentee was not legally entitled to receive it. Two preliminary questions are forced upon our consideration, and demand determination before we can reach the investigation of the title of the appellees. They are: Did the appellant, Hartman, ever acquire any right to or equitable interest in the land which was injuriously affected by the issue of the patent to Warren? If not, can he maintain a suit in equity to charge the holders of the legal title under this patent with a trust for his benefit?

The act of April 11, 1860 (12 Stat. 836), gave the appellant the right to locate his Porterfield warrants upon any of the public lands not "otherwise appropriated at the time of such location." He first applied to locate them on this land on March 11, 1889. The land had then been selected, located, entered, and paid for by Warren by the surrender of his certificate of identity for more than three years. How could the appellant have any right to locate his warrants on this land, while the location of Warren stood uncanceled? Why were not these lands "otherwise appropriated" by the location of Warren, when Hartman made his application? It is contended that Warren's location was void because he was not a person entitled to the benefits of the treaty of September 30, 1854 (10 Stat. 1109), under which he made it, and because he unlawfully sold his certificate of identity before he made his entry. But this position is untenable. The land department of the United States is a special tribunal vested with judicial powers, whose decisions upon questions within its jurisdiction are impregnable to collateral attack, and conclusive until they are reversed on appeal or set aside by proper proceedings in equity. It was the province and duty of that department to hear and decide the questions whether or not Warren was a mixed blood belonging to the Chippewas of Lake Superior, and entitled to 80 acres of land under the provisions of the treaty of September 30, 1854, and whether or not he was entitled to locate and enter the particular tract of land here in dispute under that treaty. It tried the former question, and on January 22, 1875, adjudged that he was one of the beneficiaries of that treaty. It tried the latter question, decided that he was entitled to enter the land here in dispute, and issued to him a certificate that he had located it, on October 15, 1885. These judgments stood unchallenged on March 11, 1889, when the appellant offered to locate his warrants upon this land, and, even if they might have been avoided by proper proceedings, they were not void. The only parties who had any interest in the subject-matter of these decisions, when they were rendered, were the United States and Warren. The officers of the land department, who rendered them, had jurisdiction of both

these parties, and of the subject-matter of their judgments. Their decisions were, therefore, valid and effective adjudications, whether they were right or wrong. U. S. v. Winona & St. P. R. Co., 15 C. C. A. 96, 103, 107, 67 Fed. 948, 954, 955, 958, 959; St. Paul, M. & M. Ry. Co. v. St. Paul & N. P. Ry. Co., 15 C. C. A. 167, 68 Fed. 2. The legal effect of Warren's location, which was permitted by these decisions, was to segregate this land from the public domain and to appropriate it to his claim under the treaty of 1854. Even if he was not in fact qualified to make the location, his entry was valid on its face, and, until it was canceled or set aside, it segregated the land from the public domain, and appropriated it to private use as effectually as it would have done if Warren had been legally entitled to make it. Wilcox v. Jackson, 13 Pet. 496, 513; Witherspoon v. Duncan, 4 Wall. 210, 218; Carroll v. Safford, 3 How. 441; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112; McIntyre v. Roeschlaub, 37 Fed. 556; Railroad Co. v. Forseth, 3 Land Dec. 446, 447; Railroad Co. v. Leech, 3 Land Dec. 506; Hollants v. Sullivan, 5 Land Dec. 115, 118; Henry Milne, 14 Land Dec. 242. The appellant had, therefore, no right to enter this land under his Porterfield warrants, on March 11, 1889, because it was not then public land of the United States, but was otherwise appropriated.

But counsel for the appellant insists that, if Hartman acquired no right to the land by his offer to locate it with his Porterfield warrants, on March 11, 1889, he did acquire, under section 2 of the act of May 14, 1880 (21 Stat. 141, c. 89, § 2), the right to be preferred in the acquisition of the title to it, by virtue of his attack upon the location and entry of Warren, which he instituted on March 19, 1889. Section 2 of the act of May 14, 1880, provides:

"In all cases where any person has contested, paid the land office fees, and procured the cancellation of any pre-emption, homestead, or timber-culture entry, he shall be notified by the register of the land-office of the district in which such land is situated, of such cancellation, and shall have thirty days from the date of such notice to enter said lands. * * *"

The argument is that, if the officers of the land office had correctly decided the questions of law presented to them, the location of Warren would have been canceled, and Hartman would have acquired the right to be preferred in the acquisition of the land under this section. But it will not do for the courts to say, in the face of the plain terms of this statute, and the accepted meaning of the term "preemption entry" in the legislation and jurisprudence of the nation, as counsel for appellant argue, that any entry of the public land, from which any one acquires the preferred right to obtain it, is a preemption entry. It would be as reasonable to try to maintain that every entry of land, upon which the entryman had or intended to have a home, was a homestead entry, or that every entry of land on which he cultivated or intended to cultivate trees was a timber-culture entry. The expressions, "pre-emption entry," "homestead entry," and "timber-culture entry," have accepted and well-recognized significations in the acts of congress, in the decisions of the courts, and in common parlance. A "timber-culture entry" is an entry under the

provisions of "An act to encourage the growth of timber on Western prairies," approved March 3, 1873 (17 Stat. 605, c. 277), and the various amendments and additions thereto. Rev. St. p. 451, §§ 2464–2469. A "homestead entry" is an entry under the provisions of the act of congress entitled "An act to secure homesteads to actual settlers upon the public domain," approved May 20, 1862 (12 Stat. 392, c. 75), and the various amendments and additions thereto. Rev. St. p. 419, c. 5. The distinguishing characteristic of a pre-emption entry is that, where such an entry is made, a preferred right to acquire the land has been secured by virtue of its occupation or improvement by the entryman. The term ordinarily refers to an entry under the act of congress entitled "An act to appropriate the proceeds of the sale of the public lands and to grant pre-emptive rights," approved September 4, 1841 (5 Stat. 453, c. 16, § 15), and the various amendments and additions thereto. Rev. St. p. 414, c. 4. But a similar preference is granted to one who obtains and improves a coal mine upon the public lands by the act of March 3, 1873 (17 Stat. 607, c. 279; Rev. St. p. 431, §§ 2347–2352); to one who irrigates and improves desert land under the act of March 3, 1877 (19 Stat. 377); and to one who was an actual settler on the Osage Indian trust and diminished reserve lands in the state of Kansas, under the act of May 9, 1872, and its amendments (17 Stat. 90, c. 149, § 1; Rev. St. p. 418, § 2283). The officers of the general land office have held that an entry under any of these acts is a pre-emption entry, within the meaning of the provisions of the act of 1880. Fraser v. Ringgold, 3 Land Dec. 69; Garner v. Mulvane, 12 Land Dec. 336; Bunger v. Dawes, 9 Land Dec. 329.

It is unnecessary to consider, and we do not decide in this case, whether this term in the act of 1880 is broad enough in its significance to cover an entry under acts of congress, other than the general pre-emption act of September 4, 1841, and its amendments, which give a preferred right to him who occupies or improves the land he seeks to enter. Conceding that its signification is broad enough for that purpose, that is, in our opinion, the extreme limit of its meaning. A long list of entries remain, to make which no preferred right can be obtained by occupation, cultivation, or improvement. There are private entries for cash; locations with bounty land warrants; locations with New Madrid certificates under the act of February 17, 1815 (3 Stat. 211), and amendments; locations with Chippewa mixed-blood scrip, under the treaty of September 30, 1854 (10 Stat. 1109), one of which is in question in this case; locations under Porterfield warrants under the act of April 11, 1860 (12 Stat. 836), one of which appellant sought to make; locations with agricultural college scrip, under the act of July 2, 1862 (12 Stat. 503), and its amendments; locations with private land scrip under the act of June 22, 1860 (12 Stat. 85), and its amendments; locations with Valentine scrip under the act of April 5, 1872 (17 Stat. 649); entries under the grants of swamp lands, of school lands, and of lands for internal improvements to the various states of the Union (Rev. St. §§ 2479–2490, 1946, 2378, 2379); and doubtless many others of like character. Here are 11 classes of entries, which have been specifically mentioned, that

are marked by the want of the characteristic that a preferred right to make them can be acquired by settlement or improvement of the land to be entered, and the entry of Warren belongs to one of these classes. The distinguishing mark of a pre-emption entry is that very characteristic. The only logical conclusion is that congress used that term to distinguish the class of entries which have this distinctive feature from those that have it not, and that it intended to subject 3 of the 14 classes which we have enumerated—that is to say, homestead entries, pre-emption entries, and timber-culture entries—to the burdens and dangers imposed by the second section of the act of 1880, and to exclude all others from the effect of its provisions.

It is suggested that the officers of the land department have reached the opposite conclusion, and have held, in effect, that by the use of this term the act of 1880 subjects every entry of the public land to the provisions of that section. After a careful perusal of the opinions of the officers of the land department, which have been cited to us, we are not satisfied that they have ever gone to that length, and, if they had, we should be compelled to decline to follow. The opinions of the officers of that department are entitled to careful consideration and may well be permitted to lead the way to the proper construction of an ambiguous statute; but where the words of an act of congress are plain, and their meaning is clear, they must prevail. Webster v. Luther, 16 Sup. Ct. 963, 967; U. S. v. Tanner, 147 U. S. 661, 663, 13 Sup. Ct. 436; Merritt v. Cameron, 137 U. S. 542, 11 Sup. Ct. 174; U. S. v. Graham, 110 U. S. 219, 3 Sup. Ct. 582; Swift Co. v. U. S., 105 U. S. 691. After a deliberate consideration of all the terms of the act of 1880 in the light of the legislation for the disposition of the public lands in force when it was enacted, all doubt of its true construction has been dispelled, and we have become satisfied that the preferred right to enter land granted to the contestant by the second section of that act was granted to the successful contestant of a pre-emption, homestead, or timber-culture entry only, that the entry of Warren was neither of these, and that Hartman acquired no right to be preferred in the acquisition of this land by his contest of the claim of Warren. In view of this conclusion, it is immaterial that there was a regulation of the land department under which he would have been entitled to such a preferred right, if he had succeeded. The land department may undoubtedly make reasonable regulations for the conduct of the business intrusted to it and the discharge of the duties imposed upon it, provided, always, that they are not inconsistent with the legislation enacted and the policies adopted by congress. But the act of 1880, which grants a preferred right of entry to contestants of three specific classes of entries out of more than a dozen, is an implied prohibition of any such preference to the contestants of entries which belong to the classes excluded from that enactment. Any regulation of the land department which allows such a preference is inconsistent with this prohibition, and must be disregarded.

The case of the appellant, then, is this: More than three years after Warren had entered and paid for the land, more than three years after the land department had adjudged that it was his and had is-

sued to him its certificate to that effect, but before the clerical act of issuing his patent had been performed, Hartman offered to locate upon it some Porterfield warrants that could not lawfully be so located, and his offer was rejected. From that time to the present his claim to the land has been steadily rejected, and the right of Warren to it has been uniformly maintained by the officers of the local land offices, by the commissioner of the general land office, and by the secretary of the interior. The appellant is not now, and he never has been, in privity with the United States. He has never acquired any right to or interest in the land. He is a stranger to the title, and a stranger to all the parties who have ever held it.

Can one who has acquired no right to a tract of land maintain a suit in equity to charge the owner of it with a trust in his favor, because the United States sold or granted it to that owner through an error of law? This is the next question in this case, and it is not a new question in this court. It was carefully considered and answered in the negative in the case of Deweese v. Reinhard, 10 C. C. A. 55, 59, 60, 61 Fed. 777, 781, and 19 U. S. App. 698, 706. In the opinion of this court, which was delivered by Judge Thayer in that case, will be found a careful review of many pertinent authorities and a clear statement of our views upon this question and the grounds upon which they rested. It is useless to repeat them. Suffice it to say that, in deference to the candor, zeal, and eminence of the learned counsel for the appellant, we have carefully re-examined this question, and the authorities upon it, only to be confirmed in our earlier opinion. They have cited, in support of their position, that the offer of the warrants and the contest made by Hartman gave him such an interest in this land that he could maintain this bill, and we have examined the following authorities: Winona & St. P. R. Co. v. St. Paul & S. C. R. Co., 26 Minn. 179, 2 N. W. 489; Garland v. Wynn, 20 How. 6; Silver v. Ladd, 7 Wall. 219; Johnson v. Towsley, 13 Wall. 72; Lindsey v. Hawes, 2 Black, 554; Minnesota v. Bachelder, 1 Wall. 109; Lytle v. Arkansas, 9 How. 314; Reese v. Crockett, 8 Yerg. 129; Kohlhass v. Linney, 26 Tex. 332; Cunningham v. Ashley, 14 How. 376; Ard v. Brandon, 156 U. S. 537, 543, 15 Sup. Ct. 406; Shepley v. Cowan, 91 U. S. 330; Cattle Co. v. Becker, 147 U. S. 47, 13 Sup. Ct. 217; Bisson v. Curry, 35 Iowa, 72.

Minnesota v. Bachelder was an action of ejectment, and the question under consideration was not presented there. In Winona & St. P. R. Co. v. St. Paul & S. C. R. Co., the complainant had the prior grant and the superior equity. In Cattle Co. v. Becker, the complainant held under applications to enter the land and payments for it which had been presented to and received by the register and receiver of the local land office. In Garland v. Wynn, the complainant had the senior entry, and another had fraudulently obtained a patent upon a junior one. In every other case cited by counsel for appellant, the equitable right to the land which prevailed over the legal title had been initiated by settlement upon or improvement of the land before the foundation of the claim which went to patent was laid. Under the pre-emption laws, settlement and improvement by a qualified pre-emptor gives him a right to be preferred in the pur-

chase or other acquisition of the land, where the United States had determined to sell or dispose of it. Shepley v. Cowan, 91 U. S. 330. In every case cited by counsel for appellant in which the equitable right to the land prevailed over the legal title the former had either been recognized by the United States by a grant or an entry of the land, or by the acceptance of payment for it, so that the equitable owner was in privity with the government, or the equitable right had been initiated before the claim which went to patent by a settlement or an improvement of the land under a law which gave to the settler or improver a right to be preferred in its acquisition. No authority has been cited which holds that one who is not in privity with the government, and who has never acquired any right to the land until after it was entered by the patentee, can maintain a bill to divest him of the legal title.

On the other hand, in Smelting Co. v. Kemp, 104 U. S. 636, 647, Mr. Justice Field, in delivering the opinion of the supreme court to the effect that a patent could not be successfully impeached in an action at law, said of the complainant:

"He must resort to a court of equity for relief, and even there his complaint cannot be heard unless he connect himself with the    iginal source of title, so as to be able to aver that his rights are injuriou.,y affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands. Boggs v. Mining Co., 14 Cal. 279, 363. It does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it. If the government is dissatisfied, it can, on its own account, authorize proceedings to vacate the patent or limit its operation."

This is a wise and salutary rule. It relieves the government of the expense of vexatious litigation, and the owners of land from the speculative attacks of those who have nothing to lose. It has been repeatedly announced and uniformly maintained in the national courts, and it is fatal to the suit of the appellant in this case. Cooper v. Roberts, 18 How. 173; Spencer v. Lapsley, 20 How. 264, 273; Beard v. Federy, 3 Wall. 478, 492; McIntyre v. Roeschlaub, 37 Fed. 556; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856.

The decree below must be affirmed, with costs, and it is so ordered.