[Civil No. 1470. Filed June 2, 1916.]

[157 Pac. 1019.]

CLEVE W. VAN DYKE, IDA VAN DYKE, His Wife, and PATRICK H. McGUIRE, Appellants, v. ARIZONA EASTERN RAILROAD COMPANY, a Corporation, Appellee.

1. PUBLIC LANDS — RAILROAD RIGHT OF WAY OVER PUBLIC LANDS. — Under Act Cong. March 3, 1875, c. 152, 18 Stat. 482 (U. S. Comp. Stats. 1913, §§ 4921–4926), a railroad right of way over public lands may be acquired in two ways, to wit, by the actual construction of the road or by the approval of the Secretary of the Interior after definite location and filing profile of the road in the local land office.

2. PUBLIC LANDS—RAILROAD RIGHT OF WAY—PRESUMPTIONS.—Where a railroad has been granted a permit under Act Cong. March 3, 1899, c. 427, 30 Stat. 1233 (U. S. Comp. Stats. 1913, § 4945), to enter a forest reserve and its map of location approved by the Secretary of the Interior, it must be presumed that the road has conformed with the rules of the Interior Department, that it was rightfully upon the reservation, and that the construction was sanctioned by the proper authorities.

3. PUBLIC LANDS—RAILROAD RIGHT OF WAY ACQUIRED BY CONSTRUCTION.—The actual construction of a railroad having proper permission under Act Cong. March 3, 1899, to enter a forest reserve invests the railroad with title to its right of way.

4. PUBLIC LANDS—RAILROAD RIGHT OF WAY—LIMITATION BY PURCHASE. Where a railroad company purchased a right of way over a mining location, such right of way was limited by the terms of the purchase so long as the land remained a mining location, but not when by abandonment it reverted to the public domain.

5. EQUITY—EQUITY FOLLOWS LAW.—Under the maxim that equity follows the law, a railroad right of way fixed by law at 100 feet on each side of the center line of the track cannot be reduced merely because equitable considerations would seem to entitle an adjoining land owner to a portion of such right of way.

6. CONSTITUTIONAL LAW—JUDICIAL POWERS—ENCROACHMENT.—A grant of a railroad right of way has been fixed by Congress at 100 feet on each side of the center of the track, and the power to so fix it is a legislative function which cannot be reviewed by the courts.

7. PUBLIC LANDS—RAILROAD RIGHT OF WAY—TIME OF ACQUIRING TITLE. Where a railroad company long after constructing its road filed its amended map and profile in the local land office, its title to its right of way was initiated by construction of the road and not by filing such map.

8. PUBLIC LANDS — HOMESTEAD — TIME OF ACQUIRING TITLE. — Where defendant after holding land under a mining location abandoned it and immediately established a homestead residence thereon which finally ripened into a patent, his title as against a railroad claiming a right of way dated from his homestead residence, not from his prior mining location.

9. PUBLIC LANDS—RAILROAD RIGHT OF WAY—CAPACITY TO ACQUIRE.— One holding title to a homestead, on which residence was acquired subsequent to the construction of a railroad, cannot attack the grant of right of way on the ground that the railroad had no capacity to accept the grant.

[As to existence of right of way of railroad as breach of covenant of warranty in deed, see note in Ann. Cas. 1912C, 650.]

APPEAL from a judgment of the Superior Court of the County of Gila.   G. W. Shute, Judge.   Affirmed.

Messrs. Sloan & Westervelt and Mr. F. C. Jacobs, for Appellants.

Messrs. Rawlins & Little, for Appellee.

ROSS, C. J.—Action by appellee railroad company to quiet title to right of way extending across the northwest quarter of the southeast quarter of section 30, township 1 north, range 15 east, Gila county; the appellant Cleve W. Van Dyke being the homestead patentee of said premises from the government of the United States. Fifty feet on each side of the center line of the track, or 100 feet of the right of way, are not involved in this suit; the area in question being the excess

of 100 feet up to 200 feet, amounting to 2.23 acres. The case was tried to the court without a jury, and judgment entered quieting appellee's title as prayed. The court made findings of fact, which we condense below, together with such other facts as we deem essential to a determination of the case:

The appellee, a railroad corporation, succeeded the Gila Valley, Globe & Northern Railway Company, and acquired all its rights, property, franchises, rights of way and all of its other assets. In March, 1906, the Gila Valley, Globe & North-ern Railway Company surveyed and platted a line of railroad from Globe to Miami, Arizona, about nine miles in length, passing over and across certain public lands, and thereafter, on November 5, 1908, filed in the local land office its map or profile of definite location of its railroad under the act of Congress of March 3, 1875. Prior to the filing of said map or profile, to wit, July 1, 1908, under executive order the land covered by map or profile as well also the land in dispute was thrown into the Crook national forest reserve. April 19, 1909, the Gila Valley, Globe & Northern Railway Company made application to the commissioner of the general land office for permission to enter the Crook national forest reserve, and on the sixth day of July was granted permission to go into, over, and upon the national reserve and to locate and to construct its said railroad thereon. The map and profile of its railroad was approved September 21, 1909, by the Secretary of the Interior pursuant to the act of Congress approved March 3, 1875.

The Gila Valley, Globe & Northern Railway Company commenced in April, 1909, the construction of its railroad and completed the same in September, 1909, and it and appellee have operated its trains ever since October 5, 1909. Before construction was commenced, on, to wit, November and December, 1908, the Gila Valley, Globe & Northern Railway Company amended its line of survey and changed the course of said line and located it upon and across the lands described in the complaint, marked and staked the amended lines and right of way on the ground along the entire length of said premises to the extent of 100 feet in width on each side of the center line of said railroad so located. The road was constructed on the amended location conforming on the ground to the staked and marked line.

At the time of the amended location and at the time of the construction of the road and until November, 1909, the premises in dispute were held by the Miami Land & Improvement Company, a corporation, as mineral land by regular location, and on September 27, 1909, the Gila Valley, Globe & Northern Railway Company accepted a deed from the Miami Land & Improvement Company conveying to it a right of way across the premises in question in width 50 feet on each side of the center of track and across the entire length of premises.

The land in dispute was, by executive order, restored to the public domain and became open to settlement on December 22, 1909, on which date appellant Cleve W. Van Dyke filed upon the same under the homestead law. He had theretofore occupied the same under an option to purchase it as a mineral location from the Miami Land & Improvement Company. On that date he went off the ground, but immediately returned establishing residence with a view of homesteading. In due course he made final homestead proof, and on February 12, 1912, a patent without any reservation was issued to him for his homestead. December 30, 1909, the Gila Valley, Globe & Northern Railway Company filed its amended map and profile of its right of way in the local land office, which was regularly and duly approved March 4, 1911.

Appellant Cleve W. Van Dyke attempted to show that he established residence upon the premises prior to December 22, 1909, the date upon which he filed his homestead entry. It is clear that he did not go upon the premises prior to the inclusion of the land in the forest reserve. He was on the land under an option from the Miami Land & Improvement Company, claiming it as mineral ground, for some time prior to the date of his homestead filing; he attempted to show that he was there under a verbal permit from the forest supervisors and with the intention of entering the land under the homestead law, and he did actually make application to the forestry department for an examination and listing thereof under the act of June 11, 1906; application, however, was rejected. That he did not rely upon the settlement prior to December 22, 1909, is clearly shown by his own testimony. He said:

"It is a fact that about midnight on the 22d of December, 1909, I took up my residence in the house testified to. That is, I went off the ground and back on again at midnight."

December 22d was the first time this piece of land could have been settled upon without permission from the national government, and this permission he did not obtain.

The date that the appellee's rights attached to the right of way is the principal question involved. It is the contention of the appellee that its rights were fixed and established in August and September, 1909, when it completed the construction of its railroad. Appellants contend that because it changed its route as located by the original map and profile and approved by the Secretary of the Interior, and placed its line of railroad on a different route than that called for, it could have initiated and acquired no rights until it filed with the local land office on December 30, 1909, its amended map of location, and that that came too late, appellant Van Dyke having already appropriated the land, especially as against the railroad company, on December 22, 1909, by taking it as a homestead. It is conceded, as we understand it, by the appellants that if the lands through which the appellee constructed its right of way had been at the time public lands of the United States, the appellee was not bound to follow the lines as shown by its map and profile, but was at liberty to construct its railroad upon any other of the public lands along the general course of the original survey. It is said, however, that after the approval of the map and profile and before the road was constructed the land in question, together with much other land in that community, was thrown into the national forest reserve, and that this changed the rights of the appellee and restricted it to a specific right of way, to wit, the one shown by its approved map and profile, or, if changed to another and different route, it should have been with the consent of the Interior Department and upon its permission, and that since no such permission to construct a road through the disputed land was obtained, the appellee acquired no rights, at least against the appellants, by virtue of the building of a road thereon.

A right of way over the public lands may be obtained in two ways: (1) The actual construction of the road; (2) upon the approval of the Secretary of the Interior after the definite location and filing of the profile of the road in the local land office. *Jamestown & N. R. Co.* v. *Jones,* 177 U. S. 125, 44 L. Ed. 698, 20 Sup. Ct. Rep. 568; *Minneapolis, St. P. & S. Ste.*

*M. R. Co.* v. *Doughty,* 208 U. S. 251, 52 L. Ed. 474, 28 Sup. Ct. Rep. 291; *Stalker* v. *Oregon S. L. R. Co.,* 225 U. S. 143, 56 L. Ed. 1027, 32 Sup. Ct. Rep. 636; *Barlow* v. *Northern Pacific Ry. Co.,* 240 U. S. 484, 60 L. Ed. 760, 36 Sup. Ct. Rep. 456.

This is the construction given by the courts to the act of Congress of March 3, 1875, which was a general law providing the manner by which rights of way might be obtained over public lands of the United States.   March 3, 1899 (30 Stat. 1233), Congress passed an act supplementing in a way the act of March 3, 1875, authorizing the Secretary of the Interior to permit the acquisition of rights of way over the forest reservation.   The statute reads as follows:

"That in the form provided by existing law the Secretary of the Interior may file and approve surveys and plats of any right of way for a wagon road, railroad, or other highway over and across any forest reservation or reservoir site when in his judgment the public interests will not be injuriously affected thereby."

Speaking of the meaning to be given to the above provision, in *Chicago, M. & St. P. Ry. Co.* v. *United States,* 218 Fed. 288–297, 134 C. C. A. 84, 93, the court said:

"It is somewhat obscure, and just what Congress intended to accomplish by its adoption is not readily apparent; but one thing seems to be of clear intendment, and that is that the Secretary of the Interior shall only file and approve surveys and plats of rights of way when in his judgment the public interests will not be injuriously affected.   In other words, the Secretary of the Interior is made the arbiter as to when such surveys and plats shall be approved, and without such approval it is plain that a railroad company cannot acquire a right of way across a forest reserve.   If in his judgment the public interests would be injuriously affected, it would seem he could prevent, by refusal to approve the surveys and plats, any occupation of the reservations for right of way purposes. Having the power to prevent, it would seem to follow that he also has the power to approve surveys on conditions that would provide against threatened injury to the public interests, and also afford relief and reimbursement against such as might actually be sustained.   Acting upon this principle, the Secretary of the Interior has, for the exercise of his judgment

in the premises, heretofore adopted and promulgated certain rules and regulations and prescribed certain conditions calculated to safeguard the public interests in that regard. These require of the applicant for a right of way a stipulation that the right of way shall not be so located as to interfere with the proper occupation of the reservation by the government. . . . No construction can be allowed until an application for the right of way has been regularly filed in accordance with the laws of the United States and has been approved by the department, or has been considered and permission specifically given. The regulations have since been changed, so that the applicant must enter into stipulation and execute such bond as the Secretary of Agriculture may require for the protection of such reserves.''

In this case, inasmuch as the railroad company was granted a permit to enter upon the Crook national forest reserve and construct a road, it must be assumed that it conformed with all the rules and regulations of the department, and that it was rightfully upon the reservation and constructed its roadbed and laid its rails across the land in dispute with the sanction and permission of the properly constituted authorities. The soundness of this assumption is impregnable when we take in connection with the permission to enter into the reservation the approval of the map of definite location by the Secretary of the Interior. We have been unable to discover any regulation requiring that the applicant for a right of way over a national forest should accompany it with a map and profile definitely fixing and placing the location of the right of way. The practice in the present case, of granting permission upon the original map and profile, is very strong and convincing proof that no such regulation existed at the time the permission was granted.

The permission to the appellee to enter the forest reserve and construct its road having been granted on the 19th of April, 1909, it was in the months of August and September, when it constructed its road, acting within its legal rights in definitely locating its right of way "by the actual construction of the road." When the question as to whether the actual construction of the road caused the title of the right of way to be vested in the railroad company was before the

supreme court in *Jamestown & N. R. Co.* v. *Jones, supra,* Justice McKENNA used this language:

"The ruling gives a practical operation to the statute, and we think is correct. It enables the railroad company to secure the grant by an actual construction of its road, or in advance of construction by filing a map as provided in section 4 (Act of March 3, 1875). Actual construction of the road is certainly unmistakable evidence and notice of appropriation."

In this opinion is quoted with approval what Secretary Vilas said in *Dakota Central R. R. Co.* v. *Downey,* 8 L. D. 115, as follows:

" 'As to the roadway the construction of the road fixes the boundaries of the grant, and fixes it by the exact rule of the statute.' "

Some point is endeavored to be made by appellants from the fact that the land in dispute was covered by a regular mining location, and that the railroad company purchased from the mineral claimant a right of way 50 feet on each side of the center of the track through the entire 40. That the railroad company, having indicated by its purchase what it needed for its right of way, ought to be limited to that; if 200 feet were necessary for a right of way, it could have bought it or condemned it if necessary.

As long as the ground in dispute retained its status as a valid mining location, unquestionably the appellee's right of way was limited to its purchase of 50 feet on each side of the center of the track, but it was abandoned as a mining claim and immediately upon its abandonment it reverted to the public domain. Appellant Van Dyke had an option upon it as a mining claim and subsequently bought it as such, but even before the appellee had constructed its road over it he had made application to the land department to have it examined and segregated from the forest reserve so that he might file a homestead thereon. The further fact that it was subsequently homesteaded as agricultural land satisfies us that there was not at the time it was being held as mineral land any known mineral deposits thereon.

The railroad company at the time that it surveyed and mapped its right of way over the land staked and marked 100 feet on each side of the center of the track. Thus, even while

purchasing peace from the mineral claimant for a limited right of way, it was clearly and visibly claiming 200 feet.

We agree with the lower court and with counsel of appellants that the equities of the case would seem to be with the homestead claimant, but equity must follow the law. Under the law, if the appellee is entitled to any right of way whatever, it is entitled to 100 feet on each side of the center of its track.

Congress itself has fixed the amount of the grant and determined what amount was reasonable and necessary for a railroad right of way. This was properly a legislative function and cannot be reviewed by the courts. Congress had the power to give a right of way as wide or narrow as it saw fit. Having said that it should be 100 feet on each side of the center of the track, it may be no more nor less. *Oregon Short Line R. Co.* v. *Quigley,* 10 Idaho, 770, 80 Pac. 401; *Northern Pac. R. R. Co.* v. *Smith,* 171 U. S. 260, 43 L. Ed. 157, 18 Sup. Ct. Rep. 794; *Northern Pac. Ry. Co.* v. *Townsend,* 190 U. S. 267, 47 L. Ed. 1044, 23 Sup. Ct. Rep. 671; *Moran* v. *Chicago, B. & Q. R. Co.,* 83 Neb. 680, 120 N. W. 192; *Central Pac. Ry. Co.* v. *Droge,* 171 Cal. 32, 151 Pac. 663.

Appellee's rights were not initiated on the 30th of December, 1909, when it filed its amended map and profile with the local land office, but long anterior to that, to wit, in the months of August and September, when it actually constructed its road. The appellant homesteader could not complain if the railroad company had never filed a map with the local land office showing the definite location of its right of way. As was said in *Oregon Short Line R. Co.* v. *Quigley,* 10 Idaho, 770, 80 Pac. 401:

"There could be only two purposes served by the filing of the map under the provisions of this section (section 4, act of March 3, 1875)—the one for the information of the government and its land office officials to apprise them of the occupation and disposition of the public lands belonging to the government; the other purpose for the information of settlers and purchasers who desire to acquire rights in such public lands. In this case the government is not complaining of such failure, and it does not appear upon what theory a settler can be heard to complain of the failure to perform an

act by another which is solely for the information and benefit of the government.''

The appellants also insist that the appellee was not qualified under its charter to construct a road from Globe to Miami, Arizona, for the reason that its charter failed to designate such a line as within the project for which it was incorporated. The act of March 3, 1875, provides for the grant of rights of way through the public lands of the United States to any railroad duly organized under the laws of any state or territory or by Congress, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation and due proof of its organization under the same, to the extent of 100 feet on each side of the central line of said road. The record shows that the appellee made due proof before the Secretary of the Interior of its organization under the laws of the territory of Arizona, that its application for a right of way was duly approved by the Interior Department, and that it entered upon the forest reserve and constructed its road with the permission of the duly constituted authority, and that all of these acts were done before the appellant homesteader had initiated any lawful claim to the land. His rights must date from the 22d of December, 1909, the date upon which he made his application to file upon the land as a homestead. His occupation of the land before that date was tortious if not claimed under a valid mineral location. The land, in fact, was held by his predecessor and himself until midnight, December 22, 1909, as a mineral claim, at which time he went off of the land and immediately returned and established a homestead residence; this homestead right, which was finally perfected into a patent, was initiated then on the 22d of December, 1909, and not before. He can claim no interest in the land by reason of a mineral location, for that had been abandoned and he had no interest in the land as a homesteader at the time the appellee constructed its road.

In *Oregon Trunk Line* v. *Deschutes R. Co.* (C. C.), 172 Fed. 739, it was objected that the grantee of the right of way was not competent under the law to receive such a right of way because it was a Nevada corporation ''organized under a law which prohibits it from building or owning or operating a railroad in the state of its creation,'' and therefore not authorized or empowered to build a railroad in the state of

Oregon and had no capacity to take the grant in question. The court, in passing upon the point raised and others of a kindred nature, said:

"The defendant, however, is not in a position to raise any of these questions. It had no title or interest in the property at the time the map was approved which was affected thereby. . . . The Secretary of the Interior had jurisdiction and authority to dispose of the public domain, and his approval of the plaintiff's map was equivalent to the issuance of a patent to the land, and cannot be challenged by one who is not in privity with the government, or who had not acquired a right to be preferred in the acquisition of the land before such approval. 'To enable one to attack a patent from the government,' says Mr. Justice McKENNA, 'he must show that he himself is entitled to it. It is not sufficient for him to show that there may have been error in adjudging the title to the patentee. He must show that by the law properly administered the title should have been awarded to him.' *Duluth & Iron Range R. R.* v. *Roy,* 173 U. S. 590, 43 L. Ed. 820, 19 Sup. Ct. Rep. 550. See, also, *Deweese* v. *Reinhard,* 61 Fed. 777, 10 C. C. A. 55; *Hartman* v. *Warren,* 76 Fed. 157, 22 C. C. A. 30."

The appellants not being able to connect themselves with the title to this piece of land at the time that the appellee constructed its road, and it not appearing that they were then interested in the land under the claim of right now asserted, it follows that they had no interest that would entitle them to question the decision of the Secretary of the Interior holding that the appellee possessed the capacity to accept the grant.

The judgment is affirmed.

FRANKLIN, J., concurs.

CUNNINGHAM, J. (Dissenting).—The issues of fact raised upon the answer are: Whether the railroad company at any time used and enjoyed its said right of way to the extent of 100 feet on each side of the center of its railroad tracks, including the 2.23 acres in controversy; and whether the land was public in character at the time the railroad company constructed its road; and whether the railroad acquired

a right of preference over appellants under the grant by the construction of its road.

Defendants set forth their title based upon the homestead settlement and filing by Cleve W. Van Dyke made on December 22, 1909, and compliance with the homestead laws of the United States culminating in a patent issued February 12, 1912, and pray that their title be quieted.

The supreme court of the United States in *Jamestown & N. R. Co.* v. *Jones,* 177 U. S. 125, 44 L. Ed. 698, 20 Sup. Ct. Rep. 568, decided:

"(1) That a railroad company becomes specifically a grantee under the act of 1875 by filing its articles of incorporation and due proof of its organization under the same with the Secretary of the Interior.

"(2) That the lands granted were identified by a definite location of the right of way, and, sustaining the contention of the railroad that definite location could be made by actual construction of the road against the decision of the lower courts that such location could only be made by a profile map of the road, we said that the contention gives practical operation to the statute and enables the railroad company to secure the grant by an actual construction of the road, or, in advance of construction, by filing a map as provided in section 4.

"(3) Actual construction of the road is certainly unmistakable evidence and notice of appropriation."

So that court explained its decision in *Minneapolis, St. P. & S. Ste. M. R. Co.* v. *Doughty,* 208 U. S. 251, 52 L. Ed. 474, 477, 28 Sup. Ct. Rep. 291. In this last case the court said:

"But section 4 gives little play to construction or the analogies which the company invoke. That section determines the priority of rights between railroads and settlers by explicit language. A right of way is granted, but to secure it three things are necessary: (1) Location of the road; (2) filing a profile of it in the local land office; and (3) the approval thereof by the Secretary of the Interior, to be noted upon the plats in the local office. It is after these things are done that the statute fixes the right of the railroad and subjects the disposition of the land, under the land laws, to that right. 'And thereafter,' are the words of the

statute, 'all such lands over which such right of way shall pass shall be disposed of subject to such right of way.' "

In *Stalker* v. *Oregon S. L. R. Co.*, 225 U. S. 143, 56 L. Ed. 1027, 1032, 32 Sup. Ct. Rep. 636, the court explains its meaning by the use of the last-quoted language, thus:

"Neither should the case of *Minneapolis, St. P. & S. Ste. M. R. Co.* v. *Doughty,* be regarded as construing the fourth section of the act as holding that, pending the approval of a map of final location, any right may be initiated which will be superior to the title which vests upon such approval. No such question was involved in that case. What is said in the opinion about the grant of a right of way being dependent upon the doing of three things—location of road, filing profile of it in the land office, and the approval thereof by the Secretary of the Interior—and that 'thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way,' refers to the nonvesting of any right as against the United States, and not as denying the priority of right in the acquisition of the premises as between parties, growing out of priority of application."

Continuing the court says: " . . . It has been many times ruled that while no vested right against the United States is acquired until the actual approval of the list of selections (under state land grant laws requiring selection of lands by the state), the company does acquire a right to be preferred over such an intervener. In other words, the patent, when issued, relates back to the initiatory right, and cuts off all claimants whose rights were initiated later"— holding also that the same rule applies to location of rights of way granted by the act of 1875.

Consequently in this case to recover the plaintiff must establish not only that it was a qualified grantee under the act of 1875, and furnished due proof thereof, that it definitely located its grant on public lands offered, that it filed a profile map of such definite location of its road in the land office of the proper district, that such map received due approval of the Secretary of the Interior, but, further, that the definite location of the grant was fixed by some act performed, to which the approval of the Secretary of the Interior relates, and performed at a time prior to the initiation of Van Dyke's homestead rights.

The railroad company's profile map was filed in the local land office on December 30, 1909, and approved by the Secretary of the Interior March 4, 1911; hence the approval of the map gives effect to the grant as of the thirtieth day of December, 1909, as divesting on that date the title of the United States. The defendant Van Dyke settled the land and applied for homestead entry December 22, 1909, and his patent issued on February 12, 1912, and served to divest title of the United States by relation on the twenty-second day of December, 1909. Therefore the Van Dyke title is superior to the railroad's title to the land in controversy in so far as affected by the rule of priority in acquisition of right as against the United States.

The question here is whether the actual construction of the road over the premises constituting the patented homestead is such an act in the circumstances shown in this case as would deny to the appellant such priority of right as against the railroad company, and give the railroad company a right to be preferred over such intervener as to the lands in controversy. In other words, whether the actual construction of the railroad in the circumstances in evidence is such act of definite location, of the said 2.23 acres of land, as the patent when issued will relate back to as initiating a right to be preferred and cut off the right of the homesteader initiated later. The answer depends upon the public character of the land involved, and the nature of the right acquired.

The railroad was actually constructed across the homestead premises in August and September, 1909. The premises were then and prior thereto had been and thereafter were for a time held by the Miami Land & Improvement Company under regular mineral location, and said Miami Land & Improvement Company conveyed other lands to the railroad company as a right of way over and across said premises and to the extent of 50 feet in width on each side of the center of its surveyed line. Said deed of conveyance was dated September 27, 1909, and the road was actually constructed upon the right of way described in the deed. Possession of the lands described in the deed was delivered to the railroad company and by it such lands and no other were actually appropriated to its right of way purposes. No greater amount of land was used or ever has been used by the railroad company for right

of way or for any purpose other than the said strip 100 feet in width and of a length across the mining locations with the railroad along the center line. No adverse right is or could be asserted to such strip of land actually so appropriated as against the railroad company. The railroad having been actually constructed along the center of the strip and in operation was unmistakable evidence and notice of appropriation of the lands so actually used and appropriated for the said purpose. As to such lands so in the possession of the railroad company, the said company was prior in right because prior in actual appropriation, and the approval of the map of definite location relates back to such actual construction of the road definitely fixing the grant as of the date of said construction of the road to the extent of lands actually appropriated to that purpose, namely, a strip of land extending in its length across the mining locations, and fifty feet in width upon each side of the center of such track. *Jamestown & N. R. Co.* v. *Jones,* 177 U. S. 125, 44 L. Ed. 698, 20 Sup. Ct. Rep. 568. Such lands are not the subject of this action.

The purpose of the suit is to widen the right of way from 100 feet, as fixed by the deed of September 27, 1909, and confirmed by the approval of the profile map, to a width of 200 feet, the railroad company asserting its right to claim the additional width of right of way as also acquired by the grant of the act of March 3, 1875, and approval by the Secretary of the Interior. The appellants seem to concede that the right of way as it existed in extent of 100 feet in width at the time the railroad was actually constructed passed beyond their right to claim under the homestead entry. If not fully conceded the authority of *Jamestown & N. R. Co.* v. *Jones,* 177 U. S. 125, 44 L. Ed. 698, 20 Sup. Ct. Rep. 568, *supra,* is conclusive of any other claim, because title of the railroad company to such right of way became fixed and completed by the approval of the profile map under the grant. The right of the railroad company to be preferred as to its claim to such strip of ground so actually appropriated by it as against rights subsequently initiated cannot be doubted on authority or reason. Actual possession and use of the said strip of land for a right of way is actual appropriation of such lands, and the construction of the railroad thereon is a fixing definitely

of the line upon that ground, because as stated in the James-town & N. R. Co.-Jones case, the actual construction of the road is certainly unmistakable evidence of and notice of appropriation.

In *Dakota C. R. Co.* v. *Downey,* 8 L. D. 115, Secretary Vilas said:

"As to the roadway the construction of the road fixes the boundaries of the grant, and fixes it by the exact rule of the statute. . . . This must undoubtedly be the rule when the road is constructed over unsurveyed lands, because then every condition necessary to the vigor of the present grant is complied with."

Such language is used, of course, with reference to unappropriated public lands to which no prior possessory right has attached. It does not mean that if land of sufficient width on each side of the central line of the constructed road is not public land subject to the satisfaction of the grant free from conflicting claims, that the railroad company may take from a private claimant or other than the United States lands sufficient to meet the exact rule of the statute, and give such land to the railroad company in order to measure the right of way by the statute.

In *Washington & Idaho R. R. Co.* v. *Osborn,* 160 U. S. 103, 40 L. Ed. 356, 16 Sup. Ct. Rep. 219, the court said:

"It would not be easy to suppose that Congress would, in authorizing railroad companies to traverse the public lands, intend thereby to give them a right to run the lines of their roads at pleasure, regardless of the rights of settlers. Accordingly, when we examine the act of March 3, 1873, upon which the plaintiff rests its claim of right to appropriate to its use, without compensation, the land and improvements of Osborn, we find in the third section an express provision saving the rights of settlers in possession."

In this case the Miami Land & Improvement Company was in possession by Cleve W. Van Dyke of the additional strips of land here in controversy at the time the railroad was actually constructed upon the 100-foot strip conveyed and appropriated to right of way purposes, by possessory claim founded upon a regular mineral location. Such right of possession was of such nature as would require the railroad company to respect and condemn before it could appro-

priate the land and use it for right of way. This record presents no action taken of that nature having for its purpose such result. The railroad company has never had actual possession of such additional strips of land at any time for any purpose. Therefore, *Jamestown & N. R. Co.* v. *Jones, supra,* is not authority for holding that the actual construction of the railroad is certainly evidence and notice of appropriation of such additional strips of land to right of way purposes for the reason no appropriation was in fact made, and one condition, i. e., possession to give vigor to the grant—was absent. 8 L. D. 115.

The actual construction of the road appropriating a purchased right of way to its use would give the railroad company no just right to be preferred in its claim of additional ground for right of way purposes, as against a homestead settler who initiated his homestead claim before the railroad company commenced any regular proceedings to claim the right to such additional strips as one of the benefits of the grant offered by the act of 1875.

The rule of *Shepley* v. *Cowan*, 91 U. S. 330, 23 L. Ed. 424, is stated as follows:

"But whilst, according to these decisions, no vested right as against the United States is acquired until all the prerequisites for the acquisition of the title have been complied with, parties may, as against each other, acquire a right to be preferred in the purchase or other acquisition of the land, when the United States have determined to sell or donate the property. In all such cases, the first in time in the commencement of proceedings for the acquisition of the title, when the same are regularly followed up, is deemed to be the first in right."

Can one consistently and truthfully say in the circumstances shown on this record that the railroad company was first in time in the commencement of proceedings for the acquisition of the title to the additional strips of land, when the facts are that it never acquired possession of the said strips of land, never claimed the right to possession, and took no steps at any time to recover the possession by condemnation or otherwise, until the thirtieth day of December, 1909, and later when this action was commenced; that it purchased the possessory right of the mineral claimant to a right

of way lying between the two strips of land, and constructed its railroad on the said purchased strip of land, and first commenced proceedings to acquire title to said tracts or strips of additional ground after the mineral locator's rights had lapsed and the homestead settler's rights had been initiated, by filing a profile map of its located railroad, and thereby for the first time claimed as a part of its right of way the two strips of land here in controversy? I think not. The claim of the railroad company of the benefits of the grant is one of the essential conditions precedent to its right of grant. *Larsen* v. *Oregon Nav. & Ry. Co.*, 19 Or. 240, 23 Pac. 974; *Spokane Falls etc. R. Co.* v. *Ziegler*, 61 Fed. 392, 9 C. C. A. 548; Id., 167 U. S. 65, 42 L. Ed. 79, 17 Sup. Ct. Rep. 728; *Hall* v. *Russell*, 101 U. S. 509, 25 L. Ed. 829; *D. & R. G. R. Co.* v. *Wilson*, 28 Colo. 6, 62 Pac. 843; *Railroad Co.* v. *Jones*, 7 N. D. 619, 76 N. W. 227; *Enoch* v. *Spokane Falls & N. Ry. Co.*, 6 Wash. 393, 33 Pac. 966; *Railroad Co.* v. *Sture*, 32 Minn. 95, 20 N. W. 229, and the language of section 4 of the act of 1875 support the answer.

The acts of surveying and staking out a right of way according to the survey are held in *Stalker* v. *Oregon S. L. R. Co.*, 225 U. S. 143, 56 L. Ed. 1027, 1031, 32 Sup. Ct. Rep. 636, insufficient to initiate a right to claim under the grant, because, being the acts of the company alone they are changeable at its will, and may not be considered as fixing the location of the road.

The railroad company cites *Bonner* v. *Rio Grande S. R. Co.*, 31 Colo. 446, 72 Pac. 1065, in support of its prior rights. The Bonner case discloses that the railroad company claimed the benefits of the grant by filing its profile map which was approved before the adverse mineral claimant's location was commenced; hence a very different state of facts from those disclosed by this record.

The lands in controversy were included within the boundaries of a forest reserve, and therefore withdrawn from sale or donation at the time the railroad was surveyed and constructed over the mining locations, and plaintiff was granted permission to construct its road within the forest reserve. Plaintiff urges this fact as of advantage to it, and contends that it had twelve months after the lands were withdrawn from the forest reserve in which to file its map of definite

location. An answer to this contention is that the regular mineral locations within the boundaries of the forest reserve are no part of the reserve, and if it had acquired the possessory title of the locators to the additional strips of land as it acquired to the strip 100 feet in width, no question could now be raised denying its priority of right after the lands reverted to the United States and the United States offered to sell and donate the lands under the land laws of Congress.

Not having acquired the possessory right, and not having the actual possession of the additional strips of land, when the lands were offered for entry or donation, such strips of land were properly included in the offer of sale or donation and subject to appropriation under the laws of Congress by the first claimant. Van Dyke was that claimant, and thereby acquired the right to be preferred because of his diligence, and having acquired the absolute legal title through patent from the United States free from the burden of the right of way easement, the title thus acquired is prior and superior to that acquired by plaintiff, and as a consequence plaintiff has not shown a right to recover on the strength of his own title, but the matter of strength of title as the matter of preference right to the 2.23 acres of land is with the Van Dyke title, and therefore with appellants. For this reason the conclusions of law are not sustained by the facts found. The facts compel an opposite conclusion of law, viz., that plaintiff recover nothing, and that the title to said described lands be quieted in appellants, and that they recover costs.

For these reasons I am of the opinion that the judgment and decree ought to be vacated, and the cause remanded to the lower court, with instructions to enter judgment on the facts found for appellants, with costs.

---

On location of mining claim on railroad aid grant, see note in 7 L. R. A. (N. S.) 801.